# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE | § § § § § § | |
| *Plaintiffs,* | § § | |
| VS. | § § | |
| ADAMS & REESE, LLP; BREAZEALE, SACHSE & WILSON, LLP; ROBERT SCHMIDT; JAMES AUSTIN; CLAUDE F. REYNAUD, JR.; CORDELL HAYMON; THOMAS FRAZER | § § § § § § | CIVIL ACTION NO. 3:12-CV-00495-B |
| *Defendants.* | § | |

---

## PLAINTIFFS' THIRD AMENDED COMPLAINT

---

EXHIBIT

_A_

## TABLE OF CONTENTS

I.      PREFACE ................................................................................................2

II.     PARTIES ................................................................................................2

III.    PERSONAL JURISDICTION ...............................................................5

IV.     SUBJECT MATTER JURISDICTION & VENUE ...............................6

V.      FACTUAL BACKGROUND ..................................................................6

        A.      The Stanford Financial Group Empire ......................................6

        B.      Stanford Financial's Operations in the United States ...............8

        C.      The Anatomy of the Stanford Ponzi Scheme ...........................11

                a.      The Beginning: Guardian International Bank .................12

                b.      Stanford Creates a Safe Haven in Antigua .................13

                c.      The Stanford Task Force ...........................................16

                d.      Stanford Solidifies His Power with Bribes, Loans and Kickbacks...........19

                e.      Stanford Financial Was Under Constant Investigation............21

                f.      Stanford Financial Expands Sales into the United States ........................22

                g.      Stanford Financial Breeds Loyalty Through Lavish Incentives ...............24

                h.      Dissecting the Fraud ................................................24

                i.      Stanford Financial's House of Cards Finally Collapses ............................27

        D.      Defendants' Participation in the Stanford Ponzi Scheme ......................29

                a.      BSW and Reynaud Assist the Stanford Ponzi Scheme...........................29

                b.      Reynaud and BSW Discover STC's Breaches of Fiduciary Duties .........32

                c.      Reynaud Ignores His Own Conflicts of Interest ......................................34

                d.      STC's Incestuous Relationship with SIBL and SGC.............................36

                e.      The Lawyer Defendants Refer Clients to Stanford Financial ..................38

                f.      STC's Directors Discover STC's False Statements to Louisiana's OFI...39

                g.      The Lawyer Defendants' True Client Was Stanford Financial ...............44

                h.      A&R Issues a False Opinion Letter to Louisiana's OFI ..........................46

                i.      Whitney Bank Terminates its Banking Relationship with STC ..............49

                j.      Stanford Financial's IRA Plan Grows Exponentially...............................50

                k.      Stanford Financial Rewards the Lawyer Defendants' Client Referrals....51

                l.      J.D. Perry is Forced to Resign .................................................................52

|  | m. | The OFI's 2007 Examination: The Beginning of the End | 57 |
|  | n. | Stanford Financial Drafts Fake Letters to Pacify the OFI | 61 |
|  | o. | The OFI Finds Numerous Violations and Shuts Down the IRA Plan | 63 |
|  | p. | The Lawyer Defendants: Between a Rock and a Hard Place | 67 |
|  | q. | Stanford Financial Moves the IRA Plan Away From STC | 69 |
|  | r. | A&R's Final Act of Betrayal | 69 |
|  | s. | The Defendants' Culpable Conduct | 70 |
| VI. | STATUTE OF LIMITATIONS DEFENSES | | 73 |
|  | A. | Discovery Rule / Inquiry Notice / Equitable Tolling | 73 |
| VII. | CAUSES OF ACTION | | 73 |
|  | COUNT 1: | Breaches of Fiduciary Duties | 73 |
|  | COUNT 2: | Respondeat Superior | 75 |
| VIII. | ACTUAL DAMAGES | | 75 |
| IX. | PUNITIVE DAMAGES | | 76 |
| X. | CONDITIONS PRECEDENT | | 76 |
| XI. | JURY DEMAND | | 76 |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE, AND THE OFFICIAL STANFORD INVESTORS COMMITTEE | § § § § § § | |
| *Plaintiffs,* | § § | |
| VS. | § § | |
| ADAMS & REESE, LLP; BREAZEALE, SACHSE & WILSON, LLP; ROBERT SCHMIDT; JAMES AUSTIN; CLAUDE F. REYNAUD, JR.; CORDELL HAYMON; THOMAS FRAZER | § § § § § § | CIVIL ACTION NO. 3:12-CV-00495-B |
| *Defendants.* | § § | |

---

## PLAINTIFFS' THIRD AMENDED COMPLAINT

---

Ralph S. Janvey, in his capacity as the Court-Appointed Receiver for the Stanford Receivership Estate, and The Official Stanford Investors Committee file this Third Amended Complaint (the "Complaint") against Defendants BREAZEALE, SACHSE & WILSON, LLP, CLAUDE F. REYNAUD, JR., CORDELL HAYMON, and THOMAS FRAZER (collectively, the "Defendants")[1], and allege as follows:

---

[1] By this Third Amended Complaint, Plaintiffs have not re-asserted the claims against Defendants Adams & Reese, LLP, Robert Schmidt or James Austin, because Plaintiffs' claims against those Defendants were dismissed by Order dated September 11, 2013 [Docket No. 58], and Fifth Circuit law does not require re-assertion of dismissed claims in an amended complaint to preserve those claims for appeal. See *Williams v. Wynne*, 533 F.3d 360, 365 (5th Cir. 2008) (no waiver of appellant's right to appeal "by filing an amended complaint that failed to replead the claim already rejected by the district court.") (Citing *Wilson v. First Houston Inv. Corp.*, 566 F.2d 1235, 1238 (5th Cir. 1978), vacated on other grounds, 444 U.S. 959, 100 (1979)).

PLAINTIFFS' THIRD AMENDED COMPLAINT                                          PAGE 1

80276v.1

## I.    PREFACE

1.    This action is filed to recover hundreds of millions of dollars in damages suffered by the Stanford Receivership Estate as a result of Defendants' breach of their fiduciary duties as directors of Stanford Trust Company (Louisiana) ("STC").    Defendants recklessly disregarded the numerous red flags discussed in this Complaint and were grossly negligent in permitting STC to be used as a pawn by STC's affiliate, Stanford Group Company ("SGC"), to direct hundreds of millions of STC IRA account funds into worthless CDs of their affiliate Antiguan bank, Stanford International Bank, Ltd. ("SIBL").  By ignoring these red flags and acting without conducting appropriate due diligence concerning the activities and investments of SIBL, the STC directors allowed STC to be dominated, controlled and exploited by SGC, SIBL, and Stanford Financial generally, such that STC did not further its own interests but rather served the interests of the Stanford Ponzi scheme to its own detriment.  Defendant BSW is vicariously liable for the actions of its partner Claude Reynaud, who dually acted as SGC and STC's lawyer and a director of STC.

## II.    PARTIES

2.    Plaintiff Ralph S. Janvey was appointed by the United States District Court for the Northern District of Texas, Dallas Division, to serve as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of SIBL, SGC, STC, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities that the foregoing persons and entities own or control, including but not limited to Stanford Financial Group Global Management, LLC and Stanford Financial Group

---

Company (collectively, the "Stanford Receivership Estate").   In his capacity as the Receiver for the Stanford Receivership Estate, and in particular STC, Plaintiff Janvey asserted negligence claims against the Lawyer Defendants (defined below) which have previously been dismissed by the Court.   Plaintiffs reserve their right to appeal that dismissal order, which is a non-appealable interlocutory order at this time.

3.      Plaintiff The Official Stanford Investors Committee (the "Committee") was formed by this Court on August 10, 2010.  *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order").   As stated in the terms of the Committee Order, the Committee is cooperating with the Receiver to identify and prosecute actions and proceedings for the benefit of the Stanford Receivership Estate. The Receiver has assigned certain claims to the Committee, including all the claims asserted in this Complaint, except for the Receiver's negligence claims against the Lawyer Defendants (as noted above).  The Committee asserts all the assigned claims in this Complaint as an assignee from the Receiver.

4.      The court has previously dismissed the claims asserted against Defendant Adams and Reese, LLP ("A&R").  Plaintiffs reserve their right to appeal that dismissal order, which is a non-appealable interlocutory order at this time.   A&R is a law firm that provided legal services to the Stanford Financial Group, including STC and SGC.  Defendant A&R has already appeared in this action.

5.      Defendant Breazeale, Sachse & Wilson, LLP ("BSW") is a Louisiana limited liability partnership with its principal place of business in Baton Rouge, Louisiana.  BSW is a law firm that provided legal services to Stanford Financial Group, including STC and SGC. Defendant BSW has already appeared in this action.

---

6.     Defendant Robert Schmidt ("Schmidt") is an individual lawyer and citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana. He is employed by A&R. Schmidt provided legal services to Stanford Financial Group, including STC and SGC. Defendant Schmidt has  already appeared in this action. The court has previously dismissed the claims asserted against Defendant Schmidt. Plaintiffs reserve their right to appeal that dismissal order, which is a non-appealable interlocutory order at this time.

7.     Defendant James Austin ("Austin") is an individual lawyer and citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana. He is employed by A&R. Austin provided legal services to Stanford Financial Group, including STC and SGC. Defendant Austin has already appeared in  this action. The court has previously dismissed the claims asserted against Defendant Austin. Plaintiffs reserve their right to appeal that dismissal order, which is a non-appealable interlocutory order at this time.

8.     Defendant Claude F. Reynaud, Jr. ("Reynaud") is an individual lawyer and citizen of the United States currently residing in Baton Rouge, Louisiana. He is employed at BSW. Reynaud provided legal services to Stanford Financial Group, including STC and SGC. Reynaud also served as a Director of STC from 2000 until 2009. Defendant Reynaud has already appeared in this action.

9.     Defendant Cordell Haymon ("Haymon") is a citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana. Haymon served as a Director of STC from 2003 until 2008. Defendant Haymon has already appeared in this action.

10.    Defendant Thomas Frazer ("Frazer") is a citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana. Frazer served as a Director of STC from 2003 until 2008. Defendant Frazer has already appeared in this action. Mr. Frazer

passed away in 2012, and Plaintiffs have sought to join Mr. Frazer's wife, the executrix and a distributee of his succession proceeding, as a party to this action. The court has not yet ruled on this issue.

### III.    PERSONAL JURISDICTION

11.    This Court has personal jurisdiction over the non-resident Defendants under the Texas Long Arm Statute. Defendants have conducted continuous and systematic business in the State of Texas for many years and are therefore subject to general jurisdiction. Furthermore, as described herein, Defendants have engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial Group ("Stanford Financial") headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Defendants have done business and committed torts, in part, in the State of Texas.

12.    As alleged further below, Defendants A&R, BSW, Schmidt, Austin and Reynaud served as lawyers for several important companies within Stanford Financial, which is head-quartered in Houston, Texas. (Collectively, Defendants A&R, BSW, Schmidt, Austin and Reynaud are referred to as the "Lawyer Defendants".) As alleged further below, Defendants Reynaud, Haymon and Frazer served as directors for STC, which was an important segment of Stanford Financial headquartered in Houston, Texas. (Collectively, Defendants Reynaud, Haymon and Frazer are referred to as the "Director Defendants".) In their capacities as lawyers and/or directors for these Stanford Financial companies, the Lawyer Defendants and Director Defendants engaged in extensive contacts with Stanford Financial personnel based in Houston, Texas, including the General Counsel of Stanford Financial, related to their provision of services to the Texas-based Stanford Financial group of companies. In conjunction with providing these professional services, the Lawyer Defendants and Director Defendants engaged in contacts with

the State of Texas that assisted and perpetuated an important segment of the Stanford Ponzi scheme described herein. Based on their general and specific contacts with the State of Texas, the Lawyer Defendants and Director Defendants have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

13.    Furthermore, this Court has personal jurisdiction over Defendants pursuant to FED. R. CIV. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

## IV.    SUBJECT MATTER JURISDICTION & VENUE

14.    This Court has jurisdiction over this action, and venue is proper, under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754). Further, as the Court that appointed the Receiver and formed the Committee, this Court has jurisdiction over any claim brought by the Receiver, or the Committee as assignee, to execute Receivership duties. Further, within 10 days after the Court entered the Order and Amended Orders Appointing Receiver, the Receiver filed the original Securities and Exchange Commission Complaint and the Order Appointing Receiver in the United States District Court for the Southern District of Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other district where the Complaint and Order have been filed.

## V.    FACTUAL BACKGROUND

### A.    The Stanford Financial Group Empire

15.    From the mid 1980s through February 2009, R. Allen Stanford ("Stanford") — a former bankrupt gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment

funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself.  The companies operated under the brand name "Stanford Financial" with their worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies included but were not limited to: (i) the Houston, Texas-based registered broker/dealer and investment adviser company SGC;  (ii) the Houston-based administrative company that serviced all the different companies, Stanford Financial Group Company;  (iii) the Antiguan-based offshore bank Stanford International Bank Ltd. ("SIBL"); (iv) STC; (v) Stanford Trust Company Ltd. (Antigua) ("STCL"); and (vi) the representative offices of Stanford Trust Company Ltd. (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston, and San Antonio. Stanford Financial was ultimately controlled and managed principally from Houston, Texas in the United States.

16.    Stanford Financial's offshore banking operation began as Guardian International Bank in the mid 1980s.  Over the years, Stanford Financial grew into a purported full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services.  Stanford Financial gave its clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier cities.  Stanford himself made the Forbes list of the richest people in the world with a personal fortune estimated at $2.2 billion.

17.    The entire Stanford Financial operation was fueled primarily by one product: Certificates of Deposit ("CDs") issued by SIBL, the Antiguan offshore bank wholly owned by Stanford himself.  Clients who were introduced to Stanford Financial, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL CD.  SIBL CDs were sold worldwide by a web of different Stanford

Financial promoter companies, including SGC, STC and SFIS, whose function was to promote the sale of SIBL CDs. For example, to access additional investor capital in Latin America, Stanford Financial established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion). These foreign offices were ultimately controlled and administered by Stanford Financial employees in Houston, Texas. By February 2009, Stanford Financial's records reveal that SIBL had total CD account balances of approximately $7.2 billion.

## B.    Stanford Financial's Operations in the United States

18.    For the first decade of its operations, 1985 to 1995, Stanford Financial and its offshore bank (whether Guardian or SIBL) targeted a Latin American clientele. But by the late 1990s, Stanford Financial had established a foothold in the United States. In 1995, Stanford Financial established SGC, and in February 1996, SGC was registered as a broker/dealer and investment adviser. SGC established offices initially in Houston and Baton Rouge, Louisiana. SGC began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying them enormous signing bonuses to leave their jobs at other firms and transfer their books of clients over to SGC. Fueled by this influx of veteran bankers, brokers and financial advisers,

SGC grew from 6 branch offices in the United States in 2004 to more than 25 offices across the United States (but principally concentrated in the Southern United States) in 2007.

19.    Since the 1980s, Allen Stanford recognized the huge potential for marketing his offshore CDs to Latin Americans via the "gateway" city of Miami. In 1998, Stanford Financial established SFIS in order to sell the SIBL CDs to foreign investors out of Miami. SFIS was organized under Florida state law in order to evade federal banking and securities regulations. The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial, primarily from sales to CD investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela. Stanford Financial also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities.

20.    Stanford Financial also increased sales of SIBL CDs by targeting the IRA accounts of SGC's U.S. investors. In 1998, Stanford Financial established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by investors referred from SGC. After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in many cases, all of their IRA accounts into SIBL CDs.

21.    For all of these promoter companies — whether SGC, SFIS, or STC — the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial's operations and paid the employees' exorbitant salaries and bonuses. The promoter companies were all members of Stanford Financial, were ultimately owned by Stanford himself, were interconnected via intercompany marketing and referral fee agreements, and were controlled by Stanford Financial in Houston, Texas.

22.    Houston, Texas was Stanford Financial's nerve center and principal base of all operations, including SIBL, SGC, SFIS, and STC. STC was wholly owned by Houston-based

PLAINTIFFS' THIRD AMENDED COMPLAINT                                                    PAGE 9

80276v.1

SGC and controlled by Stanford Financial personnel in Houston, and virtually every member of the STC Board of Directors at any time was an employee of SGC. Stanford Financial directed STC's operations and provided all administrative functions from Houston. STC's annual budget and financial forecasts were prepared by Stanford Financial personnel in Houston, and even reimbursement of expenses for STC employees was handled out of Houston.

23.     All the sales and marketing practices for the companies comprising Stanford Financial — including *SIBL* — as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial. SIBL itself never had a marketing or sales arm in Antigua; rather it depended entirely on all the separate promoter or "feeder" companies like SGC, SFIS, and STC to sell its CDs. The head of Stanford Financial's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.

24.     The sales practices, directives, techniques, strategies and reward programs for Stanford Financial, including SIBL, were developed and crafted in Houston and disseminated to the various Stanford Financial branch offices around the world, including STC and SFIS. The sales force training manuals, promotional literature, and materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world to be utilized by the local sales force in each country.

25.     In addition, mandatory sales training for the Stanford Financial sales force for SIBL CDs was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial personnel. In those mandatory training sessions, sometimes twice a year, Stanford Financial's financial advisers ("FAs") were trained to sell the

---

image of Stanford Financial. The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads again and again.

## C.    The Anatomy of the Stanford Ponzi Scheme

26.    In reality, Stanford Financial was a massive, worldwide Ponzi scheme. The gist of the fraud was actually quite simple. Stanford Financial sold SIBL CDs through a flashy marketing campaign that was designed to trick investors into believing they were purchasing safe, secure, insured, and highly liquid CDs, which were purportedly regulated in the United States because SGC was a U.S. licensed broker/dealer. At the same time, Stanford Financial maintained a veil of secrecy over SIBL's purported investment portfolio and its use of CD investors' money. Thus, Stanford Financial went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's purported operations and assets.

27.    SIBL was actually insolvent (i.e., its liabilities exceeded the fair value of its assets) from at least 1999 and yet it continued selling CDs to the bitter end. Stanford Financial induced investors to buy CDs by offering unusually consistent and above-market rates, publishing fraudulent financial statements prepared by a small accounting firm in Antigua, C.A.S Hewlett & Co., Ltd. ("Hewlett & Co."), furnishing other data that significantly overstated SIBL's purported earnings  and assets, and misrepresenting the bank's business model, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors.

28.    In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses. SIBL's

purported assets were fraudulently inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, Stanford Financial would simply determine what level of fictitious revenue SIBL "needed" to report to entice investors, satisfy regulators, and purport to cover its CD obligations and other expenses. Stanford Financial would then "plug" the necessary revenue amount by assigning equally fictitious revenues to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

### a.    The Beginning: Guardian International Bank

29.    Allen Stanford opened his first offshore bank, Guardian International Bank Ltd. ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents). To provide the veneer of legitimacy and aid sales, Stanford established representative offices for Guardian Bank in Miami and Houston, under the name of Guardian International Investment Services ("Guardian Services"). Guardian Bank and Guardian Services provided the starting point and roadmap for creating the Stanford Financial empire, as Stanford followed this same strategy for the next 24 years: utilizing an offshore bank with U.S. sales and administrative offices in order to minimize regulatory scrutiny. Guardian Bank's main product was a certificate of deposit — with rates typically 2% to 3% above the average rates available in the U.S. market — and protected by all the confidentiality associated with offshore private banking. Stanford brought in his old college roommate James Davis to help run operations.

30.    By 1988 Stanford had been accused of violating banking laws in Texas for running unlicensed "feeder" sales offices in Houston for Guardian Bank. In 1988 and again in 1989, the U.S. Office of the Comptroller of the Currency ("OCC") issued advisories concerning Stanford's similar violations of banking laws in Florida and California.

31.     By 1989, the banking system in Montserrat came under investigation by British and U.S. authorities. Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering, so Stanford looked to move his bank to a new location. On November 28, 1990, the Financial Secretary of Montserrat notified Stanford that it was going to revoke Stanford's banking licenses because: (i) Guardian Bank's auditor, Hewlett & Co., was not an approved auditor;[2] (ii) Guardian Bank was operating in a manner "detrimental to its depositors"; (iii) Guardian Bank failed to supply satisfactory details as to its liquidity; (iv) one of Guardian Bank's directors (Allen Stanford) was formerly bankrupt; and (v) Guardian Bank had failed to submit annual financial statements.     Before the threatened revocation could be imposed, however, Stanford picked up and re-incorporated Guardian Bank in Antigua in December 1990 and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed Guardian Bank. By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although in 1994 Stanford later sued the Government of Montserrat to have that order rescinded). In effect, Stanford simply picked up his banking operations and moved them to Antigua, and continued the same basic business plan that had proven so profitable for Stanford in Montserrat. Stanford eventually changed the name of his Antiguan bank from Guardian to Stanford International Bank Ltd. (SIBL) in 1994.

**b.     Stanford Creates a Safe Haven in Antigua**

32.     Stanford could not have perpetuated this fraud without his significant influence over the Antiguan Government. To gain this influence, Stanford used bribes to curry favor with

---

[2]   The Montserrat Government determined that Guardian Bank's accountant, whom Stanford used continuously as SIBL's *only* auditor from 1987 until Stanford Financial's collapse in 2009, fell short of the standards of qualification for an approved auditor, and the government accused Stanford of only using Hewlett to "*influence the withholding of detailed information that would normally be expected in audited financial statements.*"

---

Antiguan officials and build a safe haven for his Ponzi scheme. Stanford had fled Montserrat precisely because he could not exert such pressure on the local government, and he was swept up in Montserrat's clean-up of the banking sector in the late 1980s. When Stanford fled to Antigua in December 1990, Antigua had the reputation of being the most corrupt island in the Caribbean.

33.    Stanford immediately "bought" his influence in Antigua by purchasing the ailing and insolvent Bank of Antigua. He extracted concessions from the Antiguan Government, including permits to establish a new bank by replacing Guardian Bank with SIBL and Stanford Trust Company Ltd. ("STCL"), as well as residency status in Antigua for Stanford and his top executives.

34.    In 1994, Stanford strengthened his Antiguan political ties by inserting himself and his companies into the Antiguan Government's efforts to build a new hospital. This opportunity arose after Stanford helped the Prime Minister, Lester Bird, by flying him to Houston and paying for Bird's medical expenses after Bird thought he was having a heart attack.

35.    In November of that year, Bird allowed Stanford to select contractors for the hospital project, and Stanford's bank assumed the role of lead financier on the project. Stanford's Bank of Antigua (i.e., SIBL) purportedly funded an interim loan to the Antiguan Government to finance 100% of the project's architectural and engineering costs. Eventually, SIBL lent the Antiguan Government over $40 million for the new hospital. The impoverished Antiguan Government, which in essence served as SIBL's only purported regulator, became heavily indebted to SIBL.

36.    Stanford's involvement in the hospital project prompted a 1996 U.S. Congressional investigation of corruption in Antigua, spearheaded by the FBI. The Antiguan hospital scandal ignited a firestorm of negative press in Antigua about Lester Bird, Antiguan

corruption, and Stanford's influence on the island. In November 1995, two front-page articles in Antigua's "Outlet" newspaper questioned where Stanford got $40 million to finance the project, as the Bank of Antigua likely did not have that kind of money, and the bank did not even publish its financial statements as required by Antiguan banking law. The articles also complained that Lester Bird's government had basically allowed Stanford to "run things" in Antigua, and had been giving away Antiguan land to Stanford, including the Antiguan airport and contiguous land.

37.     By 1995, Stanford was really flexing his muscle in Antigua. The government even allowed Stanford to rewrite the banking laws that regulated SIBL. In June 1995, Stanford began drafting offshore trust legislation for Antigua because Antigua had no such legislation in existence (despite the fact that Stanford had set up a "trust" company, STCL, in Antigua in 1991). Stanford's right hand and General Counsel at the time, Yolanda Suarez ("Suarez"), described how Stanford needed trust legislation for Antigua because he wanted to "develop Antigua as a platform" for offshore trust operations.

38.     In 1996, Antigua was attacked in the international press for providing a haven to money launderers and drug smugglers. Offshore banks were being established left and right. Stanford feared this undesirable press coverage would eventually disrupt or endanger SIBL. He decided that he had to "clean up" Antigua's reputation. In September 1996, Stanford's agents directed a letter to Antigua's Prime Minister, Lester Bird, and offered suggestions on how Antigua could clean up its banking sector. The letter noted how Antigua had recently been the subject of some terrible reports in the press, including an article in the Washington Post, which described how Antigua and its offshore banking sector had become a haven for fraudsters and

con artists.  The letter then suggested 15 steps for the government to address in the banking and trust areas to establish some credibility for Antigua's financial sector.

        **c.**        **The Stanford Task Force**

39.     In June 1997, at Stanford's instigation, the Antiguan Government formed and chartered the "Antiguan Offshore Financial Sector Planning Committee."  The Committee's purpose was to offer recommendations for reforming Antigua's offshore banking sector.  Not surprisingly, Stanford was appointed to *chair* the Committee.  The Committee formed a Task Force (the "Stanford Task Force") to (i) review all offshore banks licensed in Antigua to ensure they were legitimate, and (ii) evaluate Antigua's banking regulatory regime and make recommendations to address any weaknesses.

40.     Stanford appointed *every* member of the Task Force, and every member was on Stanford Financial's payroll.  The Task Force's members included three of Stanford Financial's outside lawyers; Kroll executives Tom Cash and Ivan Diaz; and several partners or associates from Stanford Financial's auditor in the United States, BDO Seidman, namely Michael Ancona, Jeffrey Balmer, Keith Ellenburg, and Barry Hersh.  No Antiguan citizen served on the Stanford Task Force.

41.     On September 15, 1997, the Task Force outlined some of its recommendations "for further development and eventual implementation" by the Antiguan Government.  In the section entitled "International Cooperation", the Task Force wrote that, while it was important for the Antiguan Government to cooperate with the judicial and regulatory authorities of other countries, at the same time, "*it is essential that Antigua and Barbuda not permit the wealth of its people and businesses to become the targets of overly aggressive enforcement actions.*"  **One way to avoid such "overly aggressive enforcement actions," according to the Task Force,**

---

80276v.1

was to revise the list of "prescribed offenses" in Antiguan law such that the Antiguan Government would only be required to cooperate with foreign governments with respect to the *"most serious of crimes, as intended, and not to lesser crimes which could conceivably be included under such vague terms as 'fraud' or 'false accounting'."*

42.     The Task Force worked closely with Wrenford Ferrance, an Antiguan Government official that Prime Minister Bird nominated as the Government's representative and liaison to the Task Force. Although he was appointed by Prime Minister Bird to serve as Antigua's Director of International Business Corporations, Ferrance looked to Stanford Financial's agents on the Task Force for guidance.

43.     The Task Force's reforms in Antigua created a new Antiguan regulatory body, the International Financial Sector Authority ("IFSA"), which was charged with supervising and regulating the offshore banking sector. Incredibly, Stanford was appointed to serve as the ***Chair of the IFSA***. Furthermore, one of Stanford Financial's U.S. lawyers served along with its Antiguan lawyer, Errol Cort, who also happened to be the Attorney General of Antigua. As a former member of the British High Commission in Barbados, Rodney Gallagher, put it: ***"Stanford effectively became the man who controlled the regulator."***

44.     After the IFSA was formed, according to news reports, Stanford's first order of business was to seize all the banking records of SIBL's offshore bank competitors in Antigua. Althea Crick, an Antiguan woman who had been appointed as the executive director of the IFSA, refused to turn the records over to Stanford. So on February 8, 1999, Stanford sent his agents to the IFSA offices in the middle of the night, where they took the locked door off its hinges,

---

stormed inside, seized file cabinets containing the confidential bank records, and then carted them off to Stanford Financial's offices to be copied.[3]

45.     The U.S. Government responded to Stanford's banking reforms and other shenanigans.  In April 1999, the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") issued an Advisory (the "Advisory") to warn banks and other financial institutions that banking transactions involving Antigua should be given enhanced scrutiny because the Antiguan government had *significantly weakened* its banking laws and regulatory agencies.  The nearly unprecedented Advisory also warned that the Antiguan Government had vested supervisory authority to a new regulator, the IFSA, which was rife with conflicts of interest because its "**board of directors includes representatives of the very institutions the Authority is supposed to regulate.**"  According to the Advisory, this "*rais[ed] serious concerns that those representatives are in fact in control of the IFSA, so that the IFSA is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards.*"  The Advisory continued,

> *The amendment of the Money Laundering (Prevention) Act, combined with changes in [Antigua's] treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua].  These changes threaten to create a 'haven' whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of [Antigua] aware.  The actions taken by the government of [Antigua] that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of [Antigua] or involving entities organized or domiciled . . . in [Antigua].*

---

[3]  Michael Bilton, "*The Texan Who Fell to Earth*", The Sunday Times, January 9, 2011.

46.     From 2005 through 2009, Stanford Financial and its outside counsel relied on these purported bank secrecy provisions to thwart several subpoenas and requests for documents from the U.S. Securities and Exchange Commission ("SEC") and other regulators who were investigating Stanford Financial's CD program.  Stanford Financial's constant refrain was that SIBL was prohibited by Antiguan secrecy laws from turning over any financial records to the SEC and other regulators.

### d.     Stanford Solidifies His Power with Bribes, Loans and Kickbacks

47.     Now firmly established in Antigua, Stanford Financial continued to strengthen its political ties with the Antiguan Government and corrupt officials.  In return for political cover, Stanford Financial eventually became a major source of funding for the entire island, eventually loaning tens of millions of dollars to the Antiguan Government.  Stanford Financial even bought the Antiguan newspaper, the Antiguan Sun, to influence the media.  By 2004, the Antiguan Government owed over $87 million to Stanford Financial — nearly *half* the island's annual tax revenues — and certain of its loans were secured by the Government's tax revenues and medical fund.

48.     Stanford continued to leverage this influence through bribes, loans and kickbacks.  Various companies within Stanford Financial loaned tens of thousands of dollars to various Antiguan Government officials.  For example, Stanford Financial companies loaned $30,000 to the Antiguan Minister of Finance, Molwyn Joseph, in February 1992, evidenced by a Promissory Note.  The Minister of Finance, *who during this time period was ultimately charged with overseeing SIBL,* never paid a dime on that loan.

49.     Stanford disguised these purported loans and other bribes as political contributions.  For example, in a May 6, 1994 memo from Stanford to his personal assistant, Jean

PLAINTIFFS' THIRD AMENDED COMPLAINT                                                      PAGE 19

Gilstrap, Stanford instructed Gilstrap to mark Molwyn Joseph's Promissory Note as "paid" and record it on company books as a political contribution. He further noted that, prior to the recent Antiguan elections, Stanford had informed Joseph that he would contribute to Joseph's political party, the ALP, by "liquidating" Joseph's personal note. Stanford also instructed Gilstrap to make sure she noted the "contribution" was made "after" the elections.

50.     Also in January 1996, Suarez prepared several spreadsheets that detailed money Stanford had loaned to senior Antiguan Government officials, either through direct loans or through credit cards, as well as loans made to the Antiguan Government. This document revealed that **11 senior Antiguan Government officials**, including Lester Bird and Molwyn Joseph (who had received a new $100,000 loan from Stanford), owed Stanford a combined $140,000.

51.     Stanford's efforts to corrupt Antiguan officials were simply brazen. A November 2003 newspaper article reported that Stanford had been accused of bribing two Antiguan Government officials — his old friend Molwyn Joseph and Gaston Browne — by giving them $100,000 each in connection with a land swap that Stanford was trying to orchestrate. The article reported that members of the Antiguan opposition party had brought motions to suspend both ministers. The article further reported that Stanford's response to these accusations was to hold a press conference in which he "surprised" the audience by cavalierly declaring that he was going to donate an additional $200,000 to each of the two Antiguan officials.

52.     Antigua's corruption and lax banking regulations is likewise borne out by the Plea Agreement entered by Stanford Financial CFO Jim Davis (the "Davis Plea"), as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's financial

regulator, the Financial Services Regulatory Commission (the "FSRC"), which replaced the previous IFSA. The Davis Plea and Indictment allege that for years, King — while acting as the CEO of the Antiguan FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other way" and would not properly perform its regulatory functions or supervise SIBL. King even entered into a bizarre "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford. As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" who relayed information to Stanford concerning the SEC's investigations of Stanford Financial and SIBL from 2005 all the way until 2009. This was all just part of the broader conspiracy to keep the Ponzi scheme alive by evading and obstructing regulatory oversight of SIBL's activities, at every turn, and in every country.

53.    The Indictment and Plea Agreement also describe how SIBL's Antiguan auditor, Hewlett & Co., accepted "special" compensation from Stanford's secret "SocGen" "slush fund" account to fraudulently report SIBL's financial condition for use in SIBL's annual reports for some 20 years. Hewlett & Co. forwarded those fraudulent "audits" to Stanford Financial in Houston, Texas every year for 20 years with full knowledge that the fraudulent audits would be utilized in Stanford Financial's marketing materials to defraud depositors.

e.    **Stanford Financial Was Under Constant Investigation**

54.    Stanford Financial was under constant investigation by numerous U.S. government agencies, including the OCC, SEC, FBI, and U.S Customs. For example, in addition to the SEC investigation of Stanford Financial that began in 2005, the FBI and U.S. Customs had been investigating Stanford's possible involvement in laundering drug money as far back as 1991. At one point, this investigation resulted in a U.S. Customs search of Stanford's private jet

---

aircraft   when he returned from the Caribbean.  After this search, FBI documents indicate that *"the Stanfords proceeded to fire a number of employees whom they suspected might be providing information to the authorities."*

55.    U.S. Customs documents from this same period described Guardian Bank as having *"constant cash flow"* from foreign depositors but *"no regulation of [the bank's] activities."*  Other documents note that U.S. Customs in San Antonio had taken an interest in the *"possible smuggling activities of principals in the Stanford organization."*  FBI documents also reveal that Stanford had been under constant investigation for possible money laundering going back to 1989, and the FBI had even sent an agent to London as part of this investigation in September 1992.   Stanford was well known to U.S. authorities and "stayed very prominently on the radar for years," says one  former FBI agent who investigated Stanford.  "There was a series of investigations.  Obviously none of them ever ended in indictments.  But we're talking various FBI field divisions, with multiple agents, then multiple agencies."

**f.    Stanford Financial Expands Sales into the United States**

56.    In 1996, Stanford Financial finally crossed the Rubicon and entered the United States securities market.  First, it registered the newly formed SGC as an SEC-licensed securities broker/dealer and investment adviser.  SGC's sole mission was to sell SIBL CDs to American investors.  At approximately this same time, Stanford Financial also expanded domestic sales of SIBL CDs to Latin American investors by establishing a representative office for Stanford Trust Company Ltd. (STCL), its Antiguan offshore trust company.

57.    In September 1998, Stanford Financial established a trust representative office in Miami, naming it Stanford Fiduciary Investor Services ("SFIS"). Stanford Financial expanded this SFIS model by opening additional SFIS "trust representative offices" in Houston and San

Antonio in 2001 and 2005. SFIS's sole mission was to sell SIBL CDs to Latin American investors, including exclusively Mexican investors through the San Antonio office. The SFIS model proved very successful: Stanford Financial sold more than $1 billion in SIBL CDs through the Miami office alone.

58.    In 1998, Stanford Financial also established STC in Baton Rouge, Louisiana. STC provided trustee and custodial services that allowed SGC to sell SIBL CDs to its clients' IRA accounts. This new IRA component of the Stanford Ponzi scheme eventually funneled hundreds of millions of dollars into Stanford Financial.

59.    In November 1998, SIBL filed a Regulation D ("Reg. D") exemption with the SEC. The exemption allowed SGC to sell SIBL CDs to "accredited investors" in the United States without registering the CDs as securities. This initial exemption, which permitted a $50 million offering, planted the seed for Stanford Financial's exponential future growth.

60.    In 2001, SIBL filed an amended Reg. D exemption to increase the offering to $150 million. By 2003, Stanford Financial had printed and distributed some 30,000 offering brochures to its FAs. In response to increasing sales to U.S. investors, SIBL filed two additional amendments in 2004 that increased the offering to $200 million and then *$1 billion*. These amendments set the stage for an intensive television advertising campaign, which Stanford Financial launched in 2005 to promote further sales to accredited investors in the United States.

61.    By March 2006, Stanford Financial had distributed 4,424 SIBL CD "Accredited Investor" packets to investors under the Reg. D offering. Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the offering to *$2 billion*.

---

### g.     Stanford Financial Breeds Loyalty Through Lavish Incentives

62.     From 2004 to 2008, Stanford Financial grew into a high-powered sales and marketing machine. The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars". To market and sell SIBL CDs, Stanford Financial established a commission structure that provided huge incentives for its FAs, including those at SGC, to "push" SIBL CDs on investors. SIBL paid disproportionately large referral fees to SGC for the sale of its CDs: SGC received a 3% referral fee for each CD sale, with 1% going to the SGC broker who made the sale. The FAs were eligible to receive an additional 1% trailing commission throughout the term of the CD. Stanford Financial also held "sales contests" and gave lavish gifts to FAs who sold the most CDs. Stanford Financial used these inflated commissions to recruit established financial advisers, and to reward advisers who aggressively sold SIBL CDs to investors. Of course, these incentives are extremely rare for bank CDs because they are economically unsustainable.

### h.     Dissecting the Fraud

63.     The ultimate reality of Stanford Financial is that it was a Ponzi scheme based out of Houston, Texas. In essence, Allen Stanford and his co-conspirators used the promise of SIBL CDs to lure investor money into Stanford Financial and then stole billions of dollars in assets from Stanford Financial companies for their own personal benefit. Substantial sums of these stolen funds were used to: (i) support the lavish lifestyles of Allen Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Allen Stanford; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) fund investments in speculative, illiquid, and

high-risk assets, including private equity holdings and massive investments in Antiguan real estate.

64.    In addition to stealing billions of dollars from Stanford Financial companies, Allen Stanford and his co-conspirators violated the Investment Company Act by failing to segregate the investor funds that SIBL received for the purchase of CDs. Instead, investor funds were commingled and then spread across all kinds of purported investments, which means Stanford Financial was actually operating as an unregistered investment "fund" that sold its internal securities product — the SIBL CDs — to investors. Stanford Financial was never registered nor legally authorized to operate as an investment company in the United States. This means that under Section 47(b) of the Investment Company Act, the investors' purchases of SIBL CDs were unenforceable by Stanford Financial. Specifically, under Section 47(b) of the Investment Company Act,

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.

15 U.S.C. § 80a-46.

65.    These facts were never disclosed to CD investors. Instead, investors were consistently and uniformly told — both verbally and via promotional materials — that Stanford Financial was compliant, authorized, and regulated by the SEC and Financial Industry Regulatory Authority ("FINRA"), and backed by insurance coverage from the Securities Investor Protection Corporation ("SIPC") and Lloyd's of London. CD investors were never told that the

---

acts of Stanford Financial and its unregistered investment company were void as a matter of law under Section 47 of the Investment Company Act.

66.    As part of this fraud, Stanford Financial also uniformly touted the high liquidity of SIBL's purported investment portfolio. For example, in its marketing materials distributed to CD investors from at least 1995 through 2009, Stanford Financial emphasized the importance of the SIBL CD's liquidity. Under the heading "Depositor Security," Stanford Financial's materials state that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors." None of that was true. Likewise, Stanford Financial trained its FAs to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide security to SIBL clients . . . ." To ensure investors would buy SIBL CDs, Stanford Financial, through its FAs, assured investors that SIBL's investments were liquid and diversified, and therefore the CDs themselves were highly liquid and could be redeemed with just a few days notice.

67.    In reality, however, billions of dollars in assets had been stolen by Allen Stanford and his co-conspirators. Contrary to Stanford Financial's verbal and written statements to investors from 1995 through 2009, Allen Stanford and his Ponzi insiders misappropriated billions of dollars in assets from Stanford Financial companies to: (i) support the lavish lifestyles of Allen Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Allen Stanford; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) invest in speculative, illiquid, and high-risk ventures, including private equity and real estate development projects in Antigua and elsewhere in the Caribbean. For example, by February 2009, Allen Stanford and his cronies had stolen at least $1.8 billion through the bogus loans alone. Stanford

Financial also failed to inform investors that hundreds of millions of dollars of depositor funds were used to create and perpetuate the charade of Stanford Financial's image, with lavish offices, excessive bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power, and prestige.

68.    As alleged in the Davis Plea and the criminal Indictment of Allen Stanford and his associates, Allen Stanford and Stanford Financial's CFO Jim Davis fabricated the nature, size, and performance of SIBL's purported investment portfolio.  Stanford Financial accountants Gilberto Lopez and Mark Kuhrt fabricated SIBL's financial statements using pre-determined returns on investments that were typically provided by Stanford or Davis.  Lopez and Kuhrt used these fictitious returns to reverse-engineer the bank's financial statements and report investment income that SIBL did not actually earn.  The information in SIBL's financial statements, created and issued by Hewlett & Co., bore no relationship to the actual performance or existence of SIBL's purported investments.  SIBL's financial statements were prepared, drafted, and approved by Hewlett & Co. in conjunction with Stanford, Davis, Lopez and Kuhrt.  As alleged by the SEC        and the United States Department of Justice, Stanford and Davis also fraudulently inflated real  estate and private equity holdings in SIBL's purported portfolio so the bank could maintain its minimum capital requirements.

### i.    Stanford Financial's House of Cards Finally Collapses

69.    In 2008, capital markets seized in a worldwide financial meltdown, and many anxious SIBL investors sought to liquidate their investments.  By October 2008, this depositor "run" on SIBL had triggered liquidity constraints that frustrated Stanford Financial's ability to satisfy client requests for redemptions and funds transfers.  Company records indicate that

---

approximately $2 billion in CDs were redeemed from January 1, 2008 through February 17, 2009. These redemptions had a huge impact on the ability of Stanford Financial's FAs to keep clients pacified, and on Stanford's ability to keep the Ponzi scheme afloat. As a result, the FAs intensified their efforts to push the CDs on investors to generate new money.

70.    In the wake of the Madoff scandal in January 2009, Venezuelan financial analyst Alex Dalmady examined SIBL's publicly available annual reports as a favor for a friend. Dalmady concluded that Stanford Financial was also an investment Ponzi scheme. He published his findings in a Venezuelan magazine under the title "Duck Tales." His findings were then re-published in various blog postings.

71.    On February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Stanford an email, copying David Nanes, that illuminated Stanford Financial's crumbling empire:

> [T]hings are starting to unravel quickly on our side in the Caribbean and Latin America...[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week ...[w]e all know what that means. There are real bullets out there with my name on [sic], David's name and many others and they are very real...[w]e are all in this together.

72.    On February 17, 2009, the SEC filed a Complaint against SGC and SIBL, as well as Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions." The SEC obtained an injunction to freeze the assets of Stanford Financial, and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial group of companies.

73.    On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation, and money laundering. Former Stanford Financial CFO Jim Davis subsequently pled guilty to

several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding. On March 6, 2012, Allen Stanford was convicted on multiple criminal counts, including wire fraud, mail fraud, obstruction of an SEC investigation, conspiracy to commit wire and mail fraud, conspiracy to obstruct an SEC investigation, and conspiracy to commit money laundering.

**D.    Defendants' Participation in the Stanford Ponzi Scheme**

74.    In 1998, Stanford Financial established the IRA component of the Ponzi scheme by acquiring the Southern Trust Company, an existing Louisiana trust company based in Baton Rouge, Louisiana. The acquisition was spearheaded by Jay Comeaux and Alvaro Trullenque, who used Stanford Financial's broker/dealer and investment adviser, SGC, to purchase Southern Trust Company's outstanding common stock and change its name to "Stanford Trust Company (Louisiana)." J.D. Perry was named as STC's new President, and the company's initial Directors included Jay Comeaux, J.D. Perry, Jay Zager, and Jason Green. STC's final Director was Yolanda Suarez, who served as Stanford Financial's General Counsel and eventual Chief of Staff. Suarez was one of Allen Stanford's most trusted confidants and a critical cog in the Stanford Ponzi machine.

**a.    BSW and Reynaud Assist the Stanford Ponzi Scheme**

75.    To close its acquisition of the Southern Trust Company, Stanford Financial needed the approval of Louisiana's Office of Financial Institutions ("OFI"), which supervises financial services companies operating in the state. During the OFI's examination of the proposed transaction, OFI Chief Examiner Sidney Seymour sent a letter dated April 13, 1998 to Stanford Financial's outside counsel requesting more detailed information about SGC and its affiliated companies. As part of this request, Chief Examiner Seymour stated that OFI wanted

more information about Allen Stanford's involvement with Guardian Bank in Montserrat (the predecessor to SIBL), which had been the subject of a troubling Banking Circular (denominated "OCC-171") published in 1989 by the United States Department of the Treasury's Office of the Comptroller of Currency. The Banking Circular concerned Guardian Bank's unauthorized banking activities in the United States and various investigations by banking regulators in Texas, Florida, and California regarding Guardian Bank's potentially illegal, unlicensed bank offices in those states.

76.     After reviewing these requests, Stanford Financial's General Counsel (and future STC Director) Yolanda Suarez concluded that SGC needed "connected" counsel in Louisiana. In early May 1998, Suarez found her man. She hired Defendant Claude Reynaud and his Baton Rouge law firm, Defendant BSW, to strengthen Stanford Financial's relationship with Louisiana's OFI and gain approval for the proposed acquisition. From the very beginning, the circumstances surrounding Reynaud's engagement put Reynaud and BSW on notice of Allen Stanford's suspicious past in Montserrat, and his ongoing efforts to operate unregulated U.S. sales offices for his offshore banks.

77.     Reynaud determined that under Louisiana law, STC would be regulated as a bank holding company and subject to the OFI's annual examinations just like the trust department of a commercial bank. But Reynaud also recognized that STC was a unique entity because it would be affiliated with SGC, which was not a bank but rather an *investment advisor* and *broker/dealer* licensed with the SEC. In May or early June 1998, Reynaud and BSW also discovered that SGC's sole shareholder, Allen Stanford, was also the sole shareholder of SIBL, Stanford Financial's offshore bank in Antigua. In other words, Defendants Reynaud and BSW learned that SIBL was affiliated with STC's proposed parent company, SGC, which meant that STC was

also affiliated with this offshore bank. At this point, both Reynaud and BSW knew about the incestuous business relationship between STC, SGC, and SIBL, all operating under the direction and control of Stanford Financial in Houston, Texas. Reynaud and BSW also learned about Stanford Financial's business plan to promote STC as a trustee and custodian so SGC could sell SIBL CDs to its clients' IRA accounts (the "IRA Plan").

78.    On June 4, 1998, Reynaud met with Suarez at Stanford Financial's offices in Houston, Texas. During this meeting, Reynaud received information from Suarez about OCC-171 and various regulatory investigations concerning Guardian Bank's unlicensed and illegal banking offices in the United States. On June 5, 1998, Reynaud and BSW responded to the OFI's letter request concerning Guardian Bank and provided documentation to the OFI relating to the surrender of Guardian Bank's license in Montserrat and an investigation by the Texas Department of Banking regarding Guardian Bank's operation of an unregistered office in Texas.

79.    On June 9, 1998, Reynaud and BSW also delivered a letter from Antigua's Minister of Finance to Louisiana's OFI. The Antiguan Minister's glowing letter personally attested to the "integrity" and "professional competence" of SIBL's operations. **In reality, *this letter was actually written by Stanford Financial* — most likely Suarez or one of her staff — and Reynaud *knew* this letter was actually written by Stanford Financial because Suarez provided him with a draft copy of the letter when Reynaud met with Suarez on June 4, 1998, *before* it was purportedly signed by Antigua's Minister of Finance.**

80.    Apparently, the fictitious letter finally tipped the scales in Stanford Financial's favor. On June 23, 1998, Louisiana's OFI conditionally approved SGC's proposed acquisition of the Southern Trust Company. Its conditional approval required the company to maintain minimum equity capital levels of $500,000, and more importantly, required the company's new

Board of Directors to "insure [sic] compliance with all applicable laws and regulations." BSW subsequently closed the transaction on July 13, 1998, with SGC purchasing approximately 99% of the Southern Trust Company's outstanding common stock. The company's name was promptly changed to Stanford Trust Company (Louisiana).

**b.    Reynaud and BSW Discover STC's Breaches of Fiduciary Duties**

81.    In late September 1998, STC opened its doors in Baton Rouge as Stanford Financial's new trust company. Stanford Financial slowly implemented its fraudulent IRA Plan by promoting STC as a trustee and custodian for SGC's IRA investor clients. STC and its parent company, SGC, executed reciprocal referral agreements that incentivized both companies to recklessly promote STC's services so SGC's IRA clients could invest their retirement funds in SIBL CDs.

82.    For example, in a Referral Agreement dated September 14, 1999, signed by Jay Comeaux for SGC and J.D. Perry for STC, SGC agreed to refer clients to STC *"who have an interest in the types of investment products that are available"* through STC. In return for these referrals, STC agreed to pay "referral" fees to SGC equal to 50% of the fees that STC earned from each referred client. Additionally, a separate agreement allowed STC to receive "referral" fees *directly from SIBL* when STC invested its clients' IRA funds in SIBL CDs. Thus, as a result of these agreements, all three related companies — STC, SGC, and SIBL — would share the various fees earned when STC invested its clients' IRA funds in SIBL CDs. **Critically, however, STC also retained the right to *"determine the suitability of the client for the purchase of any security or other investment product."*** This provision gave STC the discretion to select investments for its IRA accountholders, and with this discretion, came heightened fiduciary obligations to those accountholders.

---

83.    Stanford Financial's IRA Plan was revealed to Reynaud and BSW in October 1998 when STC's President, J.D. Perry, asked BSW to provide a legal opinion concerning any applicable laws or regulations that would prohibit STC from investing client funds in SIBL CDs. On October 12, 1998, BSW opined that: (i) SIBL CDs did not qualify as securities under applicable securities laws so long as SIBL was sufficiently well capitalized and there was "*virtually no risk that [SIBL's] insolvency [would] prevent it from repaying the holder of the certificate in full;*" and (ii) because STC was affiliated with SIBL, ***STC would need to obtain security for its investments in SIBL CDs*** (e.g., marketable bonds or other instruments from SIBL) in order to satisfy STC's "prudent" investor obligations as a fiduciary to the IRA investors, unless such security was specifically exempted by STC's trust agreements with clients.

84.    **Despite BSW's advice, STC *never* obtained the necessary security for its investments in SIBL CDs, and because of this, STC *never* fulfilled its fiduciary obligations to IRA accountholders.**    Reynaud and BSW were fully aware of these fiduciary failures. In Reynaud's capacity as an attorney for STC and Stanford Financial generally, and later in his capacity as a Director of STC, he knew about BSW's October 12, 1998 opinion, and over the years he reviewed numerous financial reports and other documents showing that STC *never* obtained the requisite collateral for its holdings of SIBL CDs. But Reynaud's and BSW's knowledge of STC's breaches of fiduciary duties to IRA accountholders never deterred Reynaud and BSW from helping Stanford Financial execute its IRA Plan. In fact, in December 1998 — just two months after BSW first recognized STC's duty to collateralize the SIBL CDs — BSW advised Stanford Financial on how to open representative "trust production offices" for STC in Florida and Texas.

### c.     Reynaud Ignores His Own Conflicts of Interest

85.     Reynaud suffered debilitating conflicts of interest because he wore too many hats in his relationship with Stanford Financial. Under one hat, Reynaud was a partial *owner* of STC who served as a member of STC's Board of Directors from 2000 until Stanford Financial's collapse in 2009. In that capacity, Reynaud had a *personal* interest in STC's success, and he also owed fiduciary duties to STC and its accountholders just like every other Director of the company. Under another hat, Reynaud was the relationship partner for BSW's attorney-client relationship with STC and Stanford Financial from 1999 until Stanford Financial's collapse in 2009. In that capacity, Reynaud leveraged his membership on STC's Board of Directors to generate lucrative legal fees for himself and BSW. Moreover, both Reynaud and BSW suffered conflicts of interest within this attorney-client relationship because they knew that their ultimate "client" was not really STC, but Stanford Financial and SGC, and their executives in Houston, Texas. And under yet another hat, Reynaud was an attorney at BSW who recommended to his other law firm clients that they invest in SIBL CDs, despite his knowledge of Stanford Financial's improprieties, the breaches of fiduciary duties by STC's and SGC's directors and officers, and STC's and SGC's own breaches of fiduciary duties to IRA clients. As discussed further below, Reynaud held his own interests above those of his clients because he recommended SIBL CDs to his clients' detriment while Stanford Financial rewarded his referrals by sending additional legal work to Reynaud and BSW.

86.     In April 1999, STC President J.D. Perry invited Reynaud to serve on STC's Board of Directors. Reynaud accepted his offer in a September 21, 1999 letter to Stanford Financial's Yolanda Suarez, in Houston, Texas. Reynaud's service as a Director entitled him to receive directors' fees, and he informed Perry that under BSW's policy, all such fees should be made to

---

Reynaud personally. In addition to receiving directors' fees, Reynaud received approximately 2,000 shares of common stock in STC, which gave him a partial ownership interest in STC.

87.    Reynaud served as a member of STC's Board of Directors for nearly ten years, and he served without interruption until STC's receivership in February 2009. In this capacity, Reynaud was involved in deliberating all of STC's major decisions about its business operations, including STC's business model, the IRA Plan, and investments in SIBL CDs for IRA accountholders. With full awareness of STC's conflicts of interest in generating so-called "referral" fees from investments in SIBL CDs, Reynaud oversaw the rapid, disproportionate growth of STC's investments in SIBL CDs (relative to other investments) from 2003 to 2008. In short, Reynaud was acutely aware of STC's improprieties through his extensive service on STC's Board of Directors, including his appointment to STC's Policy, Procedures and Administrative Committee (the "Policy Committee") in 2006, which was responsible for overseeing all of STC's policies, procedures, and legal matters. Specifically, through his service as a Director and member of the Policy Committee, Reynaud was aware that STC's primary business purpose was to enable Stanford Financial to sell as many SIBL CDs as possible to SGC's IRA accountholders.

88.    All the while, Reynaud leveraged his position on STC's Board of Directors to generate additional legal fees for himself and BSW. In February 2000, Reynaud wrote to Stanford Financial's newly appointed General Counsel, Mauricio Alvarado, to inform Alvarado about BSW's services and its relationship with Stanford Financial that, in Reynaud's words, "*is growing daily.*" In addition to BSW's regulatory advice for STC, Reynaud pointed out that BSW was also currently representing STC's parent company, SGC, in defending various broker/dealer matters. Reynaud invited Alvarado to contact him whenever SGC had any broker

---

litigation, and he described BSW's extensive experience in corporate, securities, banking, and bond matters. Reynaud invited Alvarado to meet with him personally, and he closed the letter by noting his service on STC's Board of Directors and his wishes for a *"long working relationship with you and the Stanford Financial Group."*

### d.     STC's Incestuous Relationship with SIBL and SGC

89.     By 2000, Stanford Financial was ready to implement the IRA Plan. In September 2000, Stanford Financial staff attorney Michael Contorno drafted a memo addressing whether CD products issued by an offshore bank (SIBL) were acceptable, qualified investments for IRA accounts under United States tax laws. Contorno's memo, which he addressed to Jason Green, Oreste Tonarelli, and Stanford Financial's General Counsel, Mauricio Alvarado, concluded that there were no tax-based restrictions on selling offshore CDs to IRA accounts. But Contorno raised concerns about the related-party transactions between STC, SGC, and SIBL, and he recommended that Stanford Financial obtain an independent legal opinion from Louisiana counsel to determine if there were any other legal restrictions for these transactions under Louisiana law.

90.     On September 15, 2000, Alvarado retained Louisiana law firm Jones Walker to provide this legal opinion. On September 19, 2000, a Jones Walker partner, Ted Martin, delivered his opinion that IRS regulations would not prevent SIBL from selling its CDs to STC's IRA accountholders, notwithstanding the fact that Allen Stanford was the ultimate owner of both entities. However, *Martin questioned whether the transactions would run afoul of the Louisiana Trust Code's prohibition on self-dealing, which barred STC from purchasing an affiliate's securities.* And taking a page from BSW's earlier opinion in October 1998, Martin raised the question whether STC's investments in SIBL CDs would comport with its fiduciary

obligations to invest the IRA accounts in a prudent manner. *"In view of the close relationship between [STC and SIBL],"* Martin reasoned, *"if something goes wrong STC will have a very high burden of proving that it was not imprudent."* In light of the self-dealing prohibitions under Louisiana law, and STC's receipt of referral fees from SIBL, Martin recommended that Stanford Financial disclose to each IRA accountholder that "STC will in some cases receive payments from third parties *(including [SIBL])* in connection with investments made with those third parties."

91.    Alvarado simply ignored the unfavorable portions of Martin's opinion, and on September 21, 2000, Alvarado wrote to Green and Tonarelli that he was "happy to confirm" SIBL CDs could be utilized as qualified investments in STC's IRA accounts, as long as clients were advised that STC received fees directly from SIBL. Some of Stanford Financial's executives continued to have concerns about the fee structure, however, so Ted Martin of Jones Walker was asked to provide another analysis addressing the propriety of STC receiving fees directly from SIBL for its investments in SIBL CDs. On October 27, 2000, Martin issued a separate opinion letter stating that STC's proposed fee structure did not change his earlier opinion on September 19, 2000, but he *withdrew* his initial recommendation that Stanford Financial disclose the fee arrangements among its various companies.

92.    Based on these two legal opinions from Jones Walker, Stanford Financial staff attorney Contorno advised STC's business group that it was legally permissible for STC to invest its clients' IRA accounts *exclusively* in SIBL CDs. In a memo dated October 30, 2000 and addressed to Jason Green and J.D. Perry, Contorno opined that *"[u]nless the recommendation of such an investment can be shown to be imprudent, there is no reason why an IRA need contain any other investment [beyond SIBL CDs]."* Armed with Contorno's blessing, STC and SGC

embarked on a joint campaign to aggressively market the sale of SIBL CDs for their clients' IRA accounts. STC soon began purchasing SIBL CDs "for the benefit of" its IRA accountholders, and STC retained discretionary authority to move the assets held in those IRA accounts.

### e.    The Lawyer Defendants Refer Clients to Stanford Financial

93.    During this same period, BSW and A&R embarked on their own campaign to enrich themselves at their other clients' expense. Both firms were already providing legal services to Stanford Financial, and both firms began *referring their own law firm clients to Stanford Financial*. Many of these clients purchased SIBL CDs. Through these referrals, the two firms curried favor with their powerful new client, Stanford Financial, while enjoying the lucrative legal work that Stanford Financial sent the firms to reward them for adding to Stanford Financial's bottom line. Of course, the law firms' efforts to help Stanford Financial sell more SIBL CDs did not go unnoticed at Stanford Financial.

94.    In the fall of 2000, Stanford Financial's executives exchanged emails on the subject of "Attorney Referrals." On September 19, 2000, SGC Senior Vice President Jason Green suggested to Michael Contorno that Stanford Financial send more legal work to both BSW and A&R because the firms had been referring their clients to Stanford Financial. Specifically, the email noted that A&R had been "very good about referring business to [Stanford Financial]," and Reynaud was "beginning to refer business back to [Stanford Financial]." As Green put it, "*[w]hy wouldn't we use these opportunities to deepen our existing relationships, and reward those who . . . have been adding to our bottom line via referrals[?]*" Alvarado added that Stanford Financial should also meet with Ted Martin to see if he or his partners at Jones Walker wanted to become Stanford Financial's clients, although he cautioned that "it would be best to

---

wait some time before approaching him for this purpose, so that we have time to consolidate our client-attorney relationship . . . ."

        **f.    STC's Directors Discover STC's False Statements to Louisiana's OFI**

      95.     In April 2001, a proposed change in Louisiana law threatened to derail Stanford Financial's IRA Plan. STC President J.D. Perry advised STC's Board of Directors, including Reynaud, that a Louisiana politician had submitted a bill in the state legislature to overhaul Louisiana's trust company laws, including a provision that minimum capital requirements be quadrupled to $2 million. Perry believed the bill was supported by OFI's Commissioner, John Travis. Perry informed STC's Board of Directors that he had retained a powerful lobbying firm that would give STC a "*good shot at quietly killing the entire bill*" while "*maintaining our current relationship with the OFI.*"

      96.     Later in May 2001, Perry informed STC's Board of Directors, including Reynaud, that Louisiana's OFI had taken the position that Stanford Financial had already promised to capitalize STC with $2 million back in 1998. Perry also reported that STC's lobbyist had successfully "stalled" the proposed legislation, but STC no longer needed to "kill" the bill because Perry had compromised with the OFI by negotiating a lesser capitalization requirement of $1 million. More importantly, as part of this compromise, STC and the OFI had also agreed to jointly submit an amendment to the proposed legislation that would ***exempt*** STC from its provisions.

      97.     These developments were not news to Reynaud. He had been actively involved in STC's lobbying efforts to forestall the proposed legislation. Reynaud also knew there were other critical reasons for these lobbying efforts aside from the new capitalization requirements. The regulatory reforms reflected in the proposed legislation meant that STC would no longer be

regulated as a limited-purpose bank. Stanford Financial's Yolanda Suarez had informed Reynaud that STC preferred to keep its status as a limited-purpose bank under Louisiana law because it provided more "flexibility" for operations. In a June 11, 2001 email to STC President J.D. Perry, Reynaud discussed his plans to get closer to OFI Commissioner John Travis so Reynaud could get Travis "in our camp."

98.    But on July 26, 2001, STC's carefully courted relationship with Commissioner Travis soured when the OFI's 2001 examination report for STC raised concerns about the conflicts of interest and self-dealing problems caused by STC's investments in SIBL CDs. Specifically, the OFI's report to STC's Board of Directors (the "2001 Report") stated that approximately $4.3 million in trust account funds, primarily IRAs, were currently invested in SIBL CDs, and that STC, as trustee for these accounts, had full *discretionary* authority over these investments. **The 2001 Report noted that STC's own lawyers at Jones Walker believed STC would have difficulty proving its investments in SIBL CDs were prudent because STC was affiliated with SIBL.** The OFI informed STC's Board of Directors that it shared Jones Walker's concerns about the prudence of these investments, particularly given that *SIBL CDs were not insured nor otherwise collateralized*.

99.    The 2001 Report also indicated that STC President J.D. Perry had informed the OFI during its 2001 examination that **"clients interested in more *riskier* international instruments are introduced to these CDs because of the strong returns and strength of [SIBL]."** Of course, J.D. Perry's statement to the OFI — now fully disclosed to Reynaud and the other members of STC's Board of Directors — utterly contradicted Stanford Financial's entire marketing campaign for SIBL CDs as safe, low-risk investments. This marketing campaign was fully known by STC's Directors, including Defendant Reynaud.

100.    The 2001 Report also noted the OFI's disagreement with many of the conclusions in Jones Walker's opinion.  The OFI suggested that STC obtain a Private Letter Ruling from the IRS to determine: (i) whether STC was a fiduciary; (ii) whether SIBL was an affiliate of STC; and (iii) whether SIBL CDs were the same as CDs issued by banks in the United States.  The OFI's report to STC's Board of Directors closed by stating that *"Management and the Board should reevaluate this program and ensure that the risk being assumed by recommending and facilitating the purchase of these CDs is justified by the potential return to the accountholders."*[4] Notably, at the same time that Louisiana's OFI issued this report, OFI Commissioner John Travis also sent a letter to STC's Board of Directors and advised them of his decision to increase STC's minimum capital requirement to $2 million.

101.    The OFI's 2001 Report was a potential game changer for Stanford Financial's IRA Plan.  Reynaud urged Stanford Financial's Suarez to give his "solid political connections" time to influence OFI Commissioner John Travis — and he noted BSW's access to the Governor of Louisiana — but Suarez rejected his pleas and promptly flew down to Baton Rouge with *Allen Stanford himself* to meet with Travis on July 30, 2001.  Allen Stanford's desperation was evident in the parties' discussions that day, as Stanford Financial not only agreed to increase STC's capitalization to $2 million, but Allen Stanford personally promised Commissioner Travis that STC would maintain $5 million in capital as long as the OFI allowed STC to stay in business.  At the time, of course, Stanford's $5 million pledge was more than sufficient to secure the approximately $4.3 million in SIBL CDs held by STC in its clients' IRA accounts.

---

[4] All OFI examination reports provide that each member of STC's Board of Directors has a duty, in keeping with his or her responsibilities to both depositors and shareholders, to read the examination reports in detail.

---

102.    On August 6, 2001, Stanford Financial's General Counsel, Mauricio Alvarado, wrote to Ted Martin at Jones Walker and asked Martin to respond to the issues raised in the OFI's 2001 Report.    According to Alvarado, Stanford Financial needed Martin's response because "*STC did indeed rely on your analysis and offered SIBL CDs to STC's IRA clients.*" Alvarado closed the letter by stating that an IRS Letter Ruling was ***not*** desirable.

103.    On August 13, 2001, Martin responded to Alvarado's letter by opining, in effect, that STC's affiliated relationship with SIBL was ***irrelevant***.    Curiously, Martin's response seemed to contradict his prior opinion letter, dated September 19, 2000, where he questioned whether     STC's transactions in SIBL CDs would violate Louisiana's prohibition on self-dealing, and potentially breach STC's fiduciary obligations to invest IRA funds in a prudent manner. Despite these inconsistencies, Alvarado promptly forwarded Martin's opinion to J.D. Perry, Jason Green, and Stanford Financial's Chief of Staff, Yolanda Suarez, and recommended that Martin respond directly to the OFI because "Jones Walker is the largest law firm in Louisiana." Alvarado shared this decision with Reynaud. On August 15, 2001, Suarez directed Perry to instruct Jones Walker to handle the OFI so it would not include the CD program in its official audit.

104.    On August 16, 2001, Martin sent a letter to the OFI and provided his legal opinion that there was nothing wrong with STC acquiring SIBL CDs for its clients' IRA accounts — despite the fact that STC was a fiduciary for these IRA accounts — as long as STC's clients were informed about the relationship between STC and SIBL. Martin followed up with a second letter dated September 26, 2001, in which he informed the OFI of his opinion that it was proper for SIBL to   pay "referral" fees directly to STC for STC's investments in SIBL CDs because STC was ***not*** a fiduciary.    This second opinion, which completely contradicted Martin's earlier

---

opinion that STC, as a trustee, was a fiduciary, was apparently based on his assumption that STC did *not* exercise any discretion over the investments in its clients' IRA accounts.

105.    STC's Board of Directors held a meeting on August 28, 2001.  Suarez personally attended this meeting, as well as two representatives from Louisiana's OFI, Sidney Seymour and Deidre Moore, who discussed the OFI's findings in its 2001 Report.  Reynaud attended the meeting by telephone.  When the Board's discussion turned to SIBL CDs, Moore indicated that in addition to the other issues raised by the 2001 Report, she was concerned about Stanford Financial's promotion of "excess FDIC" insurance in its marketing program for SIBL CDs.  In her opinion, this promotion could mislead STC's clients into thinking SIBL CDs were insured by the FDIC.

106.    After this discussion, the OFI representatives left the meeting, and Suarez addressed STC's Board of Directors on behalf of Allen Stanford.  Suarez told the Board that Stanford was "displeased and dismayed" by this latest turn of events, and Stanford *forbid* any further communication with the OFI unless he was "in the loop."  **At this point, Reynaud defended STC's strategy but expressed his desire to be more informed about Stanford Financial as a whole so the Board could make informed decisions.**  Suarez invited Reynaud to join her in Houston, Texas to tour Stanford Financial's headquarters and discuss the rest of Stanford Financial in more detail.  Suarez also requested that STC's Board of Directors hold more of its meetings in Houston, Texas so she could attend them in person.  At her request, STC's Board of Directors did hold more of its meetings in Houston, Texas, and Reynaud (and the other Director Defendants) regularly travelled to Houston thereafter to attend those Board meetings, where Reynaud also met with Suarez and Alvarado to discuss BSW's legal services for Stanford Financial.

### g.    The Lawyer Defendants' True Client Was Stanford Financial

107.    Reynaud reviewed all of Jones Walker's opinions at the time they were prepared and issued to Louisiana's OFI, and Reynaud became concerned during STC's ongoing debate with the OFI. But his concerns had nothing to do with the legality of the IRA Plan — which had received oddly inconsistent opinions from outside counsel and sharp criticism from the OFI — nor did his concerns relate to the role of STC's Board of Directors in helping STC execute the IRA Plan. *Rather, Reynaud was concerned about the lucrative legal fees that Stanford Financial was paying to Jones Walker instead of Reynaud and his firm, BSW.*

108.    Reynaud wanted BSW to handle all of STC's regulatory needs in Louisiana, including the company's ongoing feud with the OFI, so Reynaud and his firm could reap the valuable fees produced by this work. On August 17, 2001 — just one day after Martin sent his first response to the OFI's 2001 Report — Reynaud sent a letter to Suarez in Houston voicing his concern about the *"degree of disconnection"* between himself and Stanford Financial about BSW's ability to offer a full array of legal services. Reynaud's letter then proceeded to compare his law firm's ability to that of Jones Walker. *"On the political level,"* Reynaud boasted, *"we have as much or more political influence or contacts than any firm in the state."* Reynaud closed his letter by offering to visit Mauricio Alvarado and Suarez in Houston, Texas in order to *"firm up relationships between our firm, Stanford Trust and Stanford Group."*

109.    Reynaud's pleas to Suarez and Alvarado highlight a very important point: BSW's true client was not really STC, but *Stanford Financial* in Houston, Texas. Throughout their entire relationship with STC, Reynaud and BSW knew their ultimate client was Houston-based Stanford Financial and SGC. And both Reynaud and BSW directed their activities, counsel, and opinions to Stanford Financial's and SGC's headquarters in Houston, Texas. Furthermore,

---

Reynaud and BSW knew that SGC directed and controlled STC's operations from its offices in Houston, Texas. For example, in early 1999, STC advised Louisiana's OFI that all of STC's accounting functions would be handled by SGC in Houston, Texas. In a letter response dated May 14, 1999, the OFI informed STC that it did not object to SGC handling all of STC's accounting functions in Houston, Texas.

110. Additionally, both Reynaud and BSW knew that they suffered a conflict of interest by simultaneously representing Stanford Financial, SGC and STC. As the broker/dealer and investment adviser for STC's IRA clients, SGC was incentivized to aggressively sell SIBL CDs to those clients. But STC had a fiduciary obligation to invest its clients' IRA accounts in a safe, secure, and "prudent" manner. If Stanford Financial, SGC, STC, and SIBL had not been related parties, and if STC had not been beholden to the same ultimate owner for all four entities, then STC surely would have scrutinized SGC's recommendations and SIBL's CDs much closer. In truth, STC did *nothing* to scrutinize SGC's investment recommendations or the SIBL CDs. Reynaud and his law firm placed themselves squarely in the middle of these conflicts of interest by representing Stanford Financial, SGC and STC simultaneously. These conflicts are particularly strong given that STC was ultimately controlled by SGC and Stanford Financial, whose overarching goal was to sell as many SIBL CDs as possible to IRA accountholders.

111. The same was true of A&R: its ultimate client was not STC, but Stanford Financial and SGC in Houston, Texas. A&R opinion letters demonstrate that A&R's clients included both Stanford Financial and STC, and A&R knew that SGC directed and controlled STC's operations from its offices in Houston, Texas. Because of this knowledge, A&R and its partners directed their activities, counsel, and opinions to Stanford Financial's and SGC's headquarters in Houston, Texas. By representing all three affiliates simultaneously, A&R placed

itself squarely in the middle of the same conflicts of interest suffered by Stanford Financial, SGC and STC.

> **h.  A&R Issues a False Opinion Letter to Louisiana's OFI**

112.  On October 8, 2001, STC's Board of Directors received a letter from Louisiana's OFI enclosing the 2001 Report.  **The letter once again highlighted STC's potential self-dealing and conflicts of interest, and informed the Board that the OFI believed STC was acting as a fiduciary for its IRA accountholders, despite Ted Martin's opinion to the contrary.  The OFI further directed the Board to its comments in the 2001 Report that questioned the prudence of STC's investments in SIBL CDs.** *Finally, the OFI discussed its concerns about the Board's own failure to satisfy its fiduciary obligations.*

> *"[W]e are concerned about the apparent lack of oversight on the part of [STC's] Board of Directors as demonstrated by the infrequency of board meetings, irregular attendance, brevity of board minutes, and failure to review and approve all policies on an annual basis.  Directors have a fiduciary obligation under [Louisiana] law to discharge their duties and responsibilities in an appropriate manner.  Directors are expected to be actively involved in the company's affairs and are directly responsible for establishing policies under which it will operate.  Active participation at regular board meetings helps to ensure that directors are fully informed and adequately prepared to meet their obligations."*

113.  Stanford Financial promptly recognized the threat posed by the 2001 Report and the OFI's October 8, 2001 letter.  Stanford Financial tried to shift momentum by retaining more compliant legal counsel for its negotiations with the OFI.  Mauricio Alvarado, Stanford Financial's General Counsel, rebuffed Reynaud's pleas for additional work and turned to Louisiana law firm A&R.  On October 26, 2001, Alvarado sent a letter to Defendant Schmidt, a partner in A&R's Baton Rouge office, and outlined the scope of Stanford Financial's request:

> "The broad issue is whether STC, as trustee of an IRA, is permitted under all applicable state and federal law to place client IRA funds into CDs

issued by [SIBL].  If so, can STC earn fees as [a] result of such placement?"

114.    Over the next several weeks, Schmidt drafted and redrafted his legal opinion, and both his legal conclusions and the factual assumptions underlying those conclusions continued to evolve until his letter response crystallized in late November 2001.  In the early drafts of Schmidt's opinion, he struggled with the legalities of Stanford Financial's business structure, including whether STC and SGC would be considered joint fiduciaries to the IRA accounts, thereby making the CD investments "prohibited transactions."  But Stanford Financial's employees, including Alvarado, J.D. Perry, and Jason Green, *carefully revised Schmidt's preliminary memos by deleting large portions of Schmidt's early drafts*, and in the final draft of Schmidt's opinion, his early doubts had mysteriously vanished.  The final version of Schmidt's letter did not find *any* problems with STC's business structure, and Schmidt concluded that STC could receive "referral" fees if they were fully disclosed because STC was *not* a fiduciary.  On November 29, 2001, STC President J.D. Perry forwarded A&R's legal opinion to Reynaud and stated that STC's Board of Directors needed to "bless" STC's response to the OFI.  **Reynaud promptly approved the legal positions in STC's response**, and A&R's legal opinion was appended to STC's official response letter to the OFI dated December 12, 2001.

115.    By allowing Stanford Financial to effectively rewrite his opinion, Defendant Schmidt issued a false or misleading opinion letter that essentially approved of STC's incestuous and deeply conflicted relationship with SIBL and SGC.  In doing so, Schmidt knowingly, recklessly or negligently ignored facts known to him, including the facts that: (i) SGC, as an investment adviser, would be advising its clients to invest up to 100% of their IRA accounts in uninsured CDs held in custody at SGC's subsidiary, STC; (ii) the uninsured CDs were issued by an offshore bank that was affiliated with both SGC and STC; and (iii) the offshore bank paid

lucrative "referral" fees directly to STC and SGC for investing their clients' IRA funds in those uninsured CDs.

116.    A&R's false or misleading legal opinion enabled STC to keep the OFI at bay for several years. As a direct result, A&R's legal opinion substantially assisted Stanford Financial's IRA Plan, which would eventually cost innocent IRA accountholders at least $300 million. Additionally, A&R's false or misleading legal opinion substantially assisted the improper diversion of IRA funds by STC's directors' and officers' into the Stanford Financial group of companies, which enabled Allen Stanford and his co-conspirators to misappropriate billions of dollars in assets from Stanford Financial companies. If Defendant Schmidt had submitted a truthful and proper opinion based on the facts known to him, and concluded that STC could *not* invest its clients' IRA funds in SIBL CDs while receiving fees for those investments, then Stanford Financial's IRA Plan would have been prohibited by Louisiana's OFI, and the STC portion of the Stanford Ponzi scheme would have quickly unraveled.

117.    On February 26, 2002, OFI Commissioner John Travis sent a letter to STC's Board of Directors acknowledging the OFI's receipt of STC's December 12, 2001 response letter, which included Defendant Schmidt's false or misleading opinion letter. The OFI's letter noted STC's decision that an IRS ruling on SIBL CDs was unnecessary, and while the OFI "continued to have concerns" about STC's investments in SIBL CDs, the OFI accepted the decision of STC's Board of Directors. In essence, Commissioner Travis informed STC that the OFI was closing its 2001 examination and would no longer pursue the issues raised in its 2001 Report, including the OFI's concerns about STC's potential self-dealing, conflicts of interest, and fiduciary obligations. The "independent" legal advice provided in Defendant Schmidt's opinion letter, which summarily dismissed the OFI's concerns, was surely an important factor in

the OFI's decision to stand down and allow Stanford Financial's IRA Plan to proceed. **Commissioner Travis reiterated, however, that STC's decision not to seek an IRS ruling** *"does not relieve the Board of its fiduciary responsibility to avoid self-dealing and act prudently in the best interest of the accountholders."* <u>**Importantly, Travis also reminded STC's Board of Directors that STC could** *not* **receive a fee for investing IRA funds in SIBL CDs.**</u>

       **i.**      **Whitney Bank Terminates its Banking Relationship with STC**

     118.    Stanford Financial and its team of legal professionals had successfully dodged the bullet. In fact, their efforts to pacify Louisiana's OFI were so successful that the agency seemed to completely lose interest in STC. The OFI's annual examinations of STC from 2002 through 2006 resulted in few, if any, reported issues. Indeed, despite the glaring issues raised in its 2001 Report, the OFI did not even mention STC's investments in SIBL CDs for years.

     119.    But other entities began to sound the alarm. On January 7, 2004, Whitney Bank informed J.D. Perry by letter that it was ***terminating*** its banking relationship with STC. According to Whitney Bank's termination letter, certain affiliates of STC — most likely SGC and SIBL — had approached Whitney Bank to establish a banking relationship. As a result of its due diligence for these requests, Whitney Bank had discovered the size and scope of Stanford Financial and its affiliated web of companies, including SIBL, which Whitney Bank specifically named. Armed with this knowledge, Whitney Bank then reviewed its relationship with STC and noted STC's relationship with Stanford Financial. Notably, ***Whitney Bank indicated that it then reviewed the fund flows through STC's accounts at the bank, and based upon that review, Whitney Bank decided to promptly terminate the banking relationship.*** Under the terms of Whitney Bank's letter, STC had 30 days to move its banking elsewhere, and Whitney

---

Bank warned STC that it reserved the right to close any or all of STC's accounts *immediately* — without any further notice to STC — if "other information" came to the bank's attention.

120.    This development could have dealt a significant blow to the IRA Plan because STC used Whitney Bank's accounts to purportedly purchase SIBL CDs. But Stanford Financial quickly found a new banking partner and the STC portion of the Stanford Ponzi scheme continued its march. Upon information and belief, STC's Director Defendants knew that Whitney Bank had terminated its banking relationship with STC in January 2004.

### j.    Stanford Financial's IRA Plan Grows Exponentially

121.    Unfettered by any significant regulatory oversight from the OFI in 2002 through 2007, SGC's brokers and investment advisers convinced hundreds of clients to transfer their IRA accounts to STC and recommended that they invest those funds in SIBL CDs. In many cases, STC's clients relied on the advice of their SGC investment advisers and invested 100% of their IRA accounts — *their entire life's savings* — in SIBL CDs. These aggressive and patently imprudent business practices led to the exponential growth of STC's investments in SIBL CDs over the next several years.

122.    For example, the OFI's 2003 examination report noted that STC held almost $35 million in SIBL CDs for its IRA accountholders. In the 2004 examination report, STC's holdings of SIBL CDs had grown to over $52 million. And by 2006, STC's holdings of SIBL CDS had more than tripled to $166 million. During this period, the Director Defendants supervised and monitored STC's operations, and authorized STC to invest IRA funds in SIBL CDs so STC and SGC could earn lucrative "referral" fees from these transactions. Specifically, from 2003 through 2006, Defendants Reynaud, Frazer and Haymon all served continuously on STC's Board of Directors, supervising and monitoring STC's operations, such as reviewing

---

PLAINTIFFS' THIRD AMENDED COMPLAINT                                        PAGE 50

financial reports, capital investments, governing documents, and OFI examination reports. During this period, the Director Defendants allowed STC's investments in SIBL CDs to increase nearly five-fold, from $35 million to $166 million, despite their knowledge that STC's affiliation with SGC and SIBL and STC's perverse incentives to purchase SIBL CDs conflicted with its own fiduciary duties, and despite their complete lack of knowledge as to how STC client money was invested by SIBL. In doing so, the Director Defendants acted with so little information about SIBL that their decisions allowing STC to purchase and/or hold SIBL CDs for IRA accountholders — *without any due diligence on SIBL or its purported investment portfolio* — were unintelligent and ill-advised, and therefore constituted reckless conduct in violation of their fiduciary duties as directors of a Louisiana trust company. The Director Defendants failed to properly supervise STC's operations, failed to verify STC's compliance with its own policies and procedures, and failed to ensure STC's compliance with applicable laws and regulations.

**k.    Stanford Financial Rewards the Lawyer Defendants' Client Referrals**

123.    Reynaud personally benefitted from STC's growing investments in SIBL CDs. First, as a partial owner of STC, his ownership interest benefitted from the substantial "referral" fees that STC earned when making these investments. Second, as an attorney for STC and Stanford Financial generally, Reynaud personally benefitted because STC shared its fees with Reynaud and BSW in the form of legal fees. Reynaud had finally convinced Stanford Financial to retain BSW so his law firm could represent STC in its legal and regulatory matters, including matters concerning SIBL CDs. For example, in May 2004, STC President J.D. Perry asked Reynaud and BSW to investigate whether STC could establish a "common trust fund" as another mechanism to invest client funds in SIBL CDs. On June 8, 2004, J.D. Perry met with BSW and provided the firm with information regarding SIBL, its CDs, and the proposed fund. Attorney

---

notes from that meeting, likely written by BSW partner Van Mayhall, describe STC's proposed fund as an "upside down mutual fund." Despite Mayhall's clear description of the common trust fund as a "mutual fund," however, BSW opined in a June 17, 2004 memo that STC's fund should be *exempt* from regulation under the Investment Company Act of 1940 because STC was regulated as a bank. Furthermore, BSW concluded, STC should not have *any* legal problems when selling units in its fund to accredited investors.

124.    A&R also benefitted from STC's swelling investments in SIBL CDs by providing legal advice to Stanford Financial, including STC and SGC, and assisting Stanford Financial's efforts to access other retirement plans to fuel the expanding Ponzi scheme. For example, in approximately February 2007, Stanford Financial retained A&R to determine whether STC could act as custodian for ERISA plans and whether such plans could purchase SIBL CDs. As part of its analysis, A&R's lawyers, including Defendants Schmidt and Austin, reviewed offering materials and disclosures for the SIBL CDs. Through this review, A&R was aware that SIBL CDs were *not* insured, had *not* been registered as securities in the United States, and were *not* otherwise subject to regulation in the United States. A&R was also aware that SIBL's offering materials did *not* disclose the fact that STC received "referral" fees from SIBL. Incredibly, however, A&R furnished its opinion to Stanford Financial on February 19, 2007 that STC, as a fiduciary to an ERISA plan, could in fact purchase and hold SIBL CDs for that plan.

### l.    J.D. Perry is Forced to Resign

125.    In September 2006, J.D. Perry was forced to resign as President of STC for not being a "Stanford man" when he suggested to SGC and SFG that STC should not be so heavily reliant upon the referral fees coming from pushing the SIBL CDs on IRA account holders and should instead focus on development of other trust business. On September 7, 2006, Reynaud

notified Louisiana's OFI that Perry had resigned, and that Zack Parrish, an officer of SGC, would serve as STC's interim President. On October 12, 2006, STC's Board of Directors held a meeting to discuss STC's "overall [t]rust strategy" and the company's plan for replacing former President J.D. Perry. The Board also discussed the formation of three new committees, the Policy Committee, the Investment Policy Committee, and the Financial/Audit Committee. Over the next two years, and through the work of these new committees, STC's Board of Directors continued to learn about STC's continued and exponentially increasing reliance upon referral fee revenues paid to STC by SIBL and SGC for placing STC IRA account funds into SIBL CDs. They should have seen from the financials that STC's very existence as a viable company depended upon those revenues continuing, yet they did nothing to look into the viability of SIBL, its ability to continue paying the referral fees upon which STC's existence depended, or the investments which purportedly backed the SIBL CDs into which they were allowing hundreds of millions of dollars of STC's customers' funds to flow. Haymon as chairman of the STC Investment Policy Committee and the board even allowed STC to invest $1.5 million of its own capital into the SIBL CDs without engaging in proper due diligence to assure the investment was safe and secure. STC ended up losing $771,000 from its own investments in the SIBL CDs as a result of the directors' breaches of their fiduciary duties from the investment of STC's capital alone.

126. Later in October 2006, STC's interim President Zach Parrish asked Reynaud to serve as Chairman of STC's Policy Committee. In a letter to Parrish dated November 3, 2006, Reynaud accepted the position but expressed his broader concerns about his responsibility to the Louisiana OFI relative to STC and its corporate actions. **Reynaud acknowledged that ultimate authority for STC's actions rested with Allen Stanford, as STC was a wholly owned**

subsidiary of Stanford Financial, but Reynaud insisted that communication and consultation with STC's other Directors was important *"given the unique hybrid nature of this relationship."*

127.    The three new committees of STC's Board of Directors met on January 18, 2007. During the Investment Policy Committee meeting, members Haymon, Green, and Parrish discussed STC's client allocations, investment objectives, capital account holdings, and asset classes. The committee suggested that STC's investment allocations and objectives be modified as *target* allocations. Later that day, the Board of Directors held a meeting and the chairman of each committee reported to the Board. In attendance were Directors Frazer, Haymon, Reynaud, Bogar, Comeaux, Green, and Parrish. Reynaud, as Chairman of the Policy Committee, reported that his committee would review STC's policies and make recommendations to the Board. As part of this discussion, STC's Joe Klingen discussed STC's fee schedules with the Board. Haymon, as Chairman of the Investment Policy Committee, discussed STC's investment policy report. And Frazer, as Chairman of the Financial/Audit Committee, reported that no major adjustments to STC's financial statements were anticipated, and that his committee had approved STC's budget. Finally, interim President Parrish reported on STC's operations, including *missing documentation* in STC's client files, and STC's progress towards identifying a new President to replace J.D. Perry.

128.    In April 2007, Stanford Financial found its new man and tapped Louis Fournet to serve as STC's new President. Fournet joined STC from Hancock Bank — the successor to STC's prior banking relationship with Whitney Bank — where Fournet had been Hancock Bank's Senior Vice President and Manager of Trust Administration. STC's Board of Directors met on April 12, 2007 and approved Fournet's appointment as President. In attendance were

Frazer, Reynaud, Bogar, Comeaux, and Parrish. Haymon did not attend. Frazer reported on behalf of the Financial/Audit Committee, noting that his committee *"did not have a lot of time to review"* STC's financial statements for the first quarter of 2007. Reynaud reported on behalf of STC's Policy Committee, and Parrish reported on behalf of STC's Investment Policy Committee, noting that an investment policy had been developed to address STC's investment objectives for its capital account.

129.    Reynaud's Policy Committee met again on July 3, 2007. In attendance were members Reynaud and Comeaux, as well as STC President Fournet. The Policy Committee noted that SIBL CD investments had generated $16.3 million in funds in March 2007 alone, and that April 2007 had also generated "a large influx of [SIBL] CDs." President Fournet stated his belief that *"the Board would be interested in where production comes from."* He then reported that STC was currently developing a report that will show STC's "leading producers in [SIBL] CDs" for its IRA or trust accounts, by FA and office. Comeaux then reported that Green had already developed a progress report "for the entire network of [Stanford Financial] companies that cross sell [SIBL CDs]." Finally, Fournet discussed additional new business from SIBL CDs, including "33 new CDs booked just this week," and reported that STC was still receiving *incomplete* documentation for its CD investments.

130.    On July 13, 2007, STC's Investment Policy Committee held a meeting to discuss STC's capital account investment policy statement and capital account proposed asset allocation. In attendance were Chairman Haymon and STC President Fournet. Green was absent and Parrish voted on the committee's motions by email. The committee was given an investment presentation that included STC's current investment holdings and proposed investment

strategies, as well as STC's June 30, 2007 capital account asset listings. Finally, the committee discussed the need to appoint Fournet as a member during its next meeting.

131.    It did not take long for President Fournet to appreciate Stanford Financial's aggressive IRA Plan and STC's role in executing that plan. Similarly, however, it did not take long for Fournet to appreciate the breadth of STC's *fiduciary obligations* to its IRA clients, and the significant legal risks posed by Stanford Financial's disregard for those obligations. **On July 18, 2007, only three months after Fournet's appointment as STC's new President, STC's Senior Vice President Joe Klingen sent an email to Defendant Schmidt and asked him how STC could achieve its goal of acting as trustee of an IRA *"without taking on the 'fiduciary' liability."***

132.    The next day, July 19, 2007, STC's Board of Directors held a meeting and the chairman of each committee reported to the Board. Among other items, Financial/Audit Committee Chairman Frazer reported on a "Revenue Stream Memo" for STC, and Policy Committee Chairman Reynaud reported on STC's legal issues. Finally, Investment Policy Committee Chairman Haymon reported on STC's capital account investment policy statement, capital account summary, capital account asset allocation, and client allocations and investment objectives.

133.    STC's Board of Directors met again on September 20, 2007. In attendance were Haymon, Parrish, Reynaud, and Comeaux. Frazer, Green, and Bogar did not attend. The Board's first order of business concerned STC's financial statements. President Fournet summarized the financial statements by stating that *"STC revenue is driven by [SIBL CD] accounts."* Reynaud then reported to the Board that he and Fournet had recently met with Louisiana's OFI and the OFI "is fine" with STC's reserves, but the OFI is concerned about

STC's capital account because the OFI considers this account *"as insurance on all the [SIBL CD] accounts."* Fournet then reported on STC's strategic plan, including its recently opened offices in other states. Finally, Reynaud updated the Board on behalf of the Policy Committee, and Haymon, reporting for the Investment Policy Committee, noted that STC's investment manager was expected to achieve STC's target allocation by the end of the month.

      **m.    The OFI's 2007 Examination: The Beginning of the End**

    134.    The tables finally turned on Stanford Financial's IRA Plan when the OFI began its 2007 examination in September of that year. At the time, STC was purportedly holding $263 million in IRA accounts, and the vast majority of these funds (72%) were invested in SIBL CDs. During the examination, **the OFI discovered that STC's IRA account files did not contain** *any* **financial information or documentation supporting the appropriateness of STC's investments in SIBL CDs**, *a violation of STC's own internal policies*. **The OFI was also alarmed when it discovered that** *STC was still receiving "referral" fees* **for its investments in SIBL CDs, and these fees accounted for the vast majority of STC's income.** *Of course, the Director Defendants had always known that STC was receiving lucrative fees for its investments in SIBL CDs, and that these fees provided most of STC's income.* In fact, in addition to the various financial reports that STC's Board of Directors reviewed and discussed each year, STC's Controller Kerry Jackson had specifically informed Defendant Frazer on July 4, 2007 that STC's greatest source of revenue was the "referral" fees that SGC paid to STC for its investments in SIBL CDs. Jackson described these fees as a *"related party revenue stream wherein STC uses brokers from [SGC] to sell [SIBL CDs]."* Additionally, in STC's Board of Directors meeting on September 20, 2007, President Fournet summarized STC's financial statements by stating that *"STC revenue is driven by [SIBL CD] accounts."*

---

135.    The OFI was clearly troubled by its preliminary findings and the examiners expressed their concerns to STC. Stanford Financial promptly turned to its old friends at A&R and requested a new legal opinion on the propriety of STC's investments in SIBL CDs. Defendant Schmidt issued his new legal opinion on October 8, 2007, and with full knowledge that Stanford Financial would be using his opinion to placate the OFI, Schmidt opined that: (i) STC was *not* prohibited from purchasing SIBL CDs for its clients' IRA accounts; and (ii) neither SGC nor its FAs were prohibited from receiving fees in these transactions. ***Notably, Schmidt's new opinion did not even mention nor address the fact that STC also received fees for its investments in SIBL CDs.*** STC forwarded Schmidt's new legal opinion to Louisiana's OFI and adopted Schmidt's position that STC's substantial investments in SIBL CDs were permissible. This time, however, the OFI would not be swayed by Schmidt's legal conclusions.

136.    STC's Financial/Audit Committee met again on November 19, 2007 to discuss STC's October 2007 financial statements. In attendance were Frazer and Fournet. Bogar was absent. Fournet summarized STC's October operating results, noting that "*[SIBL CD] revenue is the main component.*"

137.    STC's Board of Directors met again on December 4, 2007. In attendance were Directors Haymon, Parrish, Reynaud, Comeaux, Fournet, Green, Bogar, and Frazer. Reporting for the Board's Financial/Audit Committee, Frazer reported on STC's financial results in September and October 2007. Reynaud, reporting for the Policy Committee, noted that many new accounts were generating fees for STC. At the request of Louisiana's OFI, the Policy Committee also reviewed STC's intercompany agreement with SGC, which governed SGC's provision of administrative services for STC. Haymon then reported to the Board on behalf of the Investment Policy Committee. Following Haymon's presentation, the Board discussed the

OFI's ongoing examination of STC, and several OFI representatives joined the meeting, including Sidney Seymour and Didrea Moore. The OFI discussed various issues raised during its examination, including STC's client accounts and the need for STC to resolve any exceptions noted in those accounts.

138.    The OFI's 2007 examination of STC continued into the following year, and after additional meetings with STC's Board of Directors, the OFI sent a letter request to STC President Fournet on January 30, 2008. **The OFI's letter requested information from STC to "verify the validity" of SIBL CDs, including a summary of STC's analyses and efforts to validate the CDs and SIBL's portfolio of assets. The letter also requested STC's authorization to contact SIBL's auditor in Antigua, Hewlett & Co., to confirm SIBL's asset portfolio.**

139.    Instead of getting a response directly from STC, however, the OFI received a response from *SGC's Director of Compliance*, Bernie Young, on February 14, 2008. Young claimed that Antiguan privacy laws prohibited SGC from producing any documents to satisfy the OFI's request to examine SIBL's portfolio. Young also informed the OFI that SGC could not facilitate its requested contact with SIBL's auditor because SGC "does not have a contractual relationship" with Hewlett & Co. Instead, Young offered to "facilitate an introduction" with SIBL's management. **In short, SGC's response made it clear to the OFI that STC could not offer anything to validate its investments of IRA funds in SIBL CDs.**

140.    In that same month, the Financial/Audit Committee of STC's Board of Directors met to discuss STC's December 2007 financial results. In attendance were Bogar and Fournet. Frazer did not attend. Fournet reviewed STC's results and noted that "affiliated company product revenue [i.e., referral fees from SIBL CDs] was **40% greater** than the previous year."

(emphasis added). On February 19, 2008, STC's Board of Directors also held a meeting to discuss STC's recent financial results and receive reports from its respective committees. In attendance were Haymon, Parrish, Comeaux, Fournet, Green, and Frazer. Reynaud and Bogar did not attend. Frazier reported to the Board on behalf of the Financial/Audit Committee. Fournet discussed STC's new accounts on behalf of the Policy Committee, and Investment Committee Chairman Haymon reported on STC's investment performance.

141.    On February 22, 2008, Reynaud sent a letter on BSW letterhead to STC President Louis Fournet and fellow STC Director Zack Parrish. In that letter, in which Reynaud described Bernie Young's letter as "our initial response" to the OFI's inquiries, Reynaud reported on two tasks that had been assigned to him by STC's Board of Directors: (i) gather intelligence on OFI's current Commissioner, John Ducrest, who was in charge of the OFI's examination; and (ii) determine the best strategy to "approach" Ducrest. Reynaud reported that Ducrest was a "lifer," in that he was a career regulator, and Ducrest had a reputation of being very professional and no-nonsense. Then, in a surprising moment of candor, Reynaud stated that

> "[a]ll of this would likely be good news if we were wanting good
> government professional appointees running our State, and I do for
> reasons obviously independent of this situation. It is, however, not
> necessarily good news from a political standpoint, because, unlike
> past commissioners, we have no political history with him. In
> addition, Mr. Ducrest's history as a fraud examiner probably
> makes him look at the offshore business of Stanford International
> Bank with an initial bit of curiosity, if not concern."

142.    Reynaud then expressed his concerns about Bernie Young's misleading and obstructive responses to the OFI.

> "I think we need to consider supplementing our letter of February
> 14, 2008. I am concerned about its overall tone, and I am very
> concerned about answers to Question Nos. 4, 5, and 8. . . . In
> particular, our response to Question No. 4 is basically to say we are
> not going to give you any information, because it is 'protected by

Antiguan privacy laws.' If you are a regulator, what does that tell you? ... The response to Question No. 5 is similar. We are telling [the] OFI that we do not have the authority to release this kind of information. *Once again, we should at least look like we are willing to cooperate.* If we have nothing to hide, and I believe we do not since I have been to the bank in Antigua, let's help [the] OFI do its job. ... Lastly, I still am of the opinion that this is a significant enough issue that the Board needs to be told and relatively soon."[5]

(emphasis added).

143.   On February 22, 2008, STC's Board of Directors met to discuss the OFI's recent questions. In attendance were Frazer, Haymon, Reynaud, Green, and Parrish. Comeaux and Bogar did not attend. Fournet reported that the OFI had raised additional questions in its examination and that Bernie Young, SGC's Chief Compliance Officer, had responded to these inquiries on behalf of STC. Fournet noted that the OFI had not yet responded to Bernie Young's letter. Reynaud reported to the Board that he recently discussed the OFI's examination with Sidney Seymour, who expressed concerns about STC's investments in SIBL CDs. Reynaud also reported that the OFI was "holding up" STC's Florida office because of these concerns. The Board discussed a possible meeting between the OFI and STC to discuss this situation further.

### n.   Stanford Financial Drafts Fake Letters to Pacify the OFI

144.   What happened next is nothing short of shocking. In order to provide some "cover" for SIBL with the OFI, STC and SGC decided that SIBL's Antiguan regulator, the FSRC, should send the OFI a letter attesting to SIBL's legitimacy. On April 8, 2008, a staff attorney at Stanford Financial named Rebecca Hamric prepared a letter that was purportedly

---

[5] The OFI's Question No. 4 requested a copy of SIBL's latest examination by the FSRC. Question No. 5 requested authority to contact SIBL's auditor, Hewlett & Co., to obtain information regarding the auditor's confirmation process for SIBL's investments and CDs, peer reports, deposit confirmation process, and CD review workpapers. Question No. 8 requested a copy of the SIBL CD brochure that STC provided to its IRA clients.

from Antigua's FSRC to Louisiana's OFI. Hamric drafted the letter for Leroy King's signature, the FSRC Director and "blood brother" to Allen Stanford, who was to print the letter on FSRC letterhead, sign it, and send it to the OFI from Antigua. Stanford Financial lawyer Hamric drafted all the language in the fake letter, including the statement that "*we found the bank to be in compliance with all regulatory guidelines and all applicable rules and regulations.*" Hamric even inserted a space at the top of the page to indicate that the letter needed to be printed on Leroy King's letterhead. Hamric then emailed the draft letter to SIBL's President, Juan Rodriguez-Tolentino, who passed it along to King.

145. The exact same letter that Hamric prepared for King's signature was then duly signed by King the very next day, April 9, 2008, and faxed back to SGC by Rodriguez-Tolentino. SGC then promptly forwarded the fraudulent letter to Louisiana's OFI that same day. Hamric did the same thing for SIBL's auditor, Hewlett & Co. She drafted a fake letter that stated exactly what she and Stanford Financial's other employees wanted it to state, and the auditor was supposed to sign and deliver the letter to the OFI. Hewlett & Co. signed the fraudulent letter that Hamric prepared and sent it to the OFI on April 10, 2008.

146. To crown the deception of these fake letters, Stanford Financial also answered Reynaud's pleas to "*look* like [STC is] willing to cooperate" by supplementing Bernie Young's initial response to the OFI. On April 11, 2008, Stanford Financial's Director of Global Compliance, Lena Stinson, sent a letter to Sidney Seymour thanking him for their meeting in the prior week and providing additional information responsive to the OFI's requests. The enclosed materials included: (i) reports from other Stanford Financial companies, including SIBL due diligence files produced by Stanford Group Holdings, Inc.; (ii) Antiguan banking laws and guidelines; (iii) the FSRC's pre-examination package for SIBL; and (iv) information regarding

SIBL's auditor, Hewlett & Co. Stinson then added that Stanford Financial had requested the FSRC and Hewlett & Co. to provide additional information directly to the OFI, which "[the OFI] should receive under separate cover." Of course, Stanford Financial and STC knew that Stanford Financial had drafted these fake letters, and that the OFI would not be receiving these letters in the *future* because they had already been provided by Stanford Financial.

147. On May 29, 2008, the Financial/Audit Committee of STC's Board of Directors met to discuss STC's annual audited financial statements. In attendance were Frazer, Fournet, Jackson and Bogar. Fournet reported to the committee that STC's revenues had increased in 2007, including a *40% increase* in revenue from STC's investments in SIBL CDs. On July 10, 2008, STC's Board of Directors met again to hear reports from its committees and discuss the OFI's continuing examination of STC. In attendance were Haymon, Fournet, Frazer, Bogar and Jim Weller. Reynaud and Parrish did not attend. Fournet reported that the OFI had not yet responded to STC regarding a final report for its 2007 examination, nor had the OFI requested any additional information. At this point, Haymon expressed his concern for STC's future business strategy. Bogar indicated that STC's overall strategy was an agenda item for discussion but STC's "clean up" process had taken time. Bogar added that Weller would be instrumental in developing STC's nationwide trust strategy.

### o. The OFI Finds Numerous Violations and Shuts Down the IRA Plan

148. Despite Stanford Financial's best efforts to sway the OFI, including its outright fabrication of third-party documents, OFI Commissioner John Ducrest stood firm. On July 21, 2008, the OFI finally issued its examination report (the "2007 Report"), where ***the OFI concluded that STC was violating numerous laws.*** In particular, the 2007 Report noted that "***a great majority of STC's growth and income since 2001 is directly related to the proliferation of***

---

*[SIBL] CDs in self-directed IRA accounts,*" and that "*much of STC's income derived from referral fees from its affiliate SGC and is directly connected with the SIBL CDs.*" **The OFI also noted that all the investment advisers for STC's IRA accounts were employed by its affiliate SGC.** The 2007 Report emphasized the OFI's growing "concern[] with the lack of diversification and apparent risk associated with this growing concentration," which "without proper due diligence and ongoing reviews of SIBL is exposing STC to an undue level of risk."

149.    In light of these factors, the OFI once again questioned the adequacy of STC's capitalization, and **the OFI informed STC that it was "no longer willing" to allow STC to continue investing its clients' IRA funds in SIBL CDs without an independent valuation of the CDs.** The OFI recommended that STC immediately obtain an independent valuation of SIBL    CDs brokered through SGC, and obtain an independent validation of the methodology being used  by SGC to determine whether clients truly qualified as "accredited investors" under Regulation D.

150.    During this hour of crisis, Stanford Financial turned once again to A&R, this time looking for some "influence" with the OFI.  On July 29, 2008, SGC's Lena Stinson informed Alvarado that she had spoken with A&R partner Jim Austin, who said he had personally known OFI Commissioner John Ducrest since they were five years old, and according to Defendant Austin, he was "well known" by Sidney Seymour and the OFI generally. At an August 5, 2008 meeting of STC's Board of Directors, which was attended by Alvarado and Stinson, STC's Directors discussed the OFI's 2007 Report and STC's process for handling the requested CD valuation.  Alvarado voiced his objection to the OFI's perceived attempt to exert jurisdiction over SIBL, but STC's Directors interjected that the OFI had jurisdiction because the CDs were being held in Louisiana IRA accounts.  On the issue of "referral" fees, Alvarado pointed to

---

STC's legal opinions from A&R and stated that STC should just *ignore* the OFI's concerns about fees.

151.    On August 5, 2008, STC's Board of Directors held a special session meeting to discuss the OFI's 2007 Report. In attendance were Haymon, Frazer, Bogar, Parrish, Weller, and Fournet. Reynaud did not attend. The OFI had given STC's Board of Directors 45 days to submit a plan of action to address the OFI's concerns, including STC's need to secure a third-party valuation of the SIBL CDs. Stanford Financial General Counsel Mauricio Alvarado pressed the Board to authorize STC to engage someone to perform the valuation. After further discussions regarding possible valuation candidates, "*Haymon then questioned whether the [SIBL CDs] had ever been valued and it was confirmed that [they] had not.*" (emphasis added). Of course, as the director of a trust company whose primary source of revenue was driven by its clients' purchases of SIBL CDs, this is something that Haymon either knew or should have already known. Haymon's question is also further evidence that the Director Defendants acted with so little information about SIBL that their decisions allowing STC to purchase and/or hold SIBL CDs for IRA accountholders — *without any due diligence on SIBL or its purported investment portfolio* — were unintelligent and ill-advised, and therefore constituted reckless conduct in violation of their fiduciary obligations as directors. The Director Defendants repeatedly failed to properly supervise STC's operations, failed to verify STC's compliance with its own policies and procedures, and failed to ensure STC's compliance with applicable laws and regulations.

152.    Frazer noted that the OFI was focused on STC's *documentation* for the valuation of SIBL CDs, and Haymon agreed. Alvarado stated that SIBL CDs were not domestic securities and that SIBL's portfolio was outside the scope of U.S. law. Alvarado cautioned against U.S.

---

regulation of foreign entities, and he believed the OFI's concern had expanded beyond the scope of SIBL's portfolio. Frazer expressed his concern that the OFI may be requesting something that STC could not provide. Bogar agreed with Frazer, and said STC had already given the OFI *everything* it could provide.

153. Haymon disagreed with Alvarado and expressed his view that the OFI was not attempting to regulate SIBL, but was seeking an analysis of the CDs' fair market value and SIBL's creditworthiness because the CDs were being held in Louisiana IRA accounts. (Of course, STC and the Director Defendants had always been duty bound to determine the CDs' fair market value and SIBL's creditworthiness, but they had continuously and utterly failed to do so.) Bogar interjected and said SIBL was strong financially, and the OFI should consider its "strong track record."

154. Haymon then expressed his concerns that STC was being asked to stop selling SIBL CDs until the third-party valuation was complete. Alvarado asked the Board to interpret the OFI's 2007 Report and determine the appropriate course of action. Haymon responded that the 2007 Report was clear that the OFI wanted STC to stop selling SIBL CDs at this time, and Frazer suggested ceasing SIBL CD sales as of July 31, 2008.

155. Frazer then expressed his concerns regarding the OFI's request that STC obtain a Private Letter Ruling from the IRS regarding the fees associated with STC's investments in SIBL CDs. Alvarado responded that STC already had two legal opinions supporting the propriety of these fees, and that STC should rely on these opinions without a ruling by the IRS. **Finally, Frazer asked if STC's fees for SIBL CDs were a referral fee or a custodial fee, *"and the latter was confirmed."***

---

156.    STC's Board of Directors met again on August 11, 2008, continuing its discussions about the OFI's 2007 Report and approving STC's retention of Defendant Austin. Following that meeting, STC and SGC executives supplied Austin with copies of SIBL's financial statements, the OFI's prior examination reports, and A&R's prior legal opinions. On August 15, 2008, in response to the OFI's 2007 Report, STC officially stopped investing its clients' IRA funds in SIBL CDs. Louis Fournet resigned as STC's President shortly thereafter in late August 2008.

**p.    The Lawyer Defendants: Between a Rock and a Hard Place**

157.    On August 27, 2008, Defendant Austin met with the OFI's Sidney Seymour to help STC get its IRA Plan back on track. During these discussions, Seymour informed Austin that the OFI had serious concerns that SIBL was violating its registration exemption under Reg. D. The  OFI also had serious concerns about the competency and independence of Antigua's banking regulators and SIBL's auditor. In fact, Seymour informed Austin that the OFI could not get Antigua's banking regulators to even speak with them. Seymour also informed Defendant Austin that the OFI could not get comfortable with Antigua's regulatory scheme because "*Antigua owes $ to Allen Stanford*" (underline in Austin's original notes). The next day, August 28, 2008, STC advised Austin that it was currently holding **$337,270,133 in SIBL CDs** in more than **1,200** IRA accounts.

158.    This was a pivotal moment in A&R's relationship with Stanford Financial, as Defendant Austin had just received information from a state regulator that raised grave concerns about the propriety of SIBL's operations, as well as those of STC and SGC. Just as importantly, however, it was a pivotal moment in A&R's relationship with the many clients and friends that the firm had referred to Stanford Financial. A&R was stuck between the proverbial rock and a

hard place: should A&R inform all these clients and friends about the OFI's disturbing revelations and the many other red flags that A&R had uncovered in its relationship with Stanford Financial? To do so, however, would mean breaching its fiduciary duties to Stanford Financial, including STC and SGC. Reynaud and his law firm, BSW, also shared this same dilemma. As Chairman of STC's Policy Committee, which oversaw all of STC's policies, procedures, and legal affairs, Reynaud knew or was at least grossly negligent in not knowing about the OFI's revelations and the red flags uncovered by *both* law firms. And like A&R, both Reynaud and BSW had also referred BSW clients to Stanford Financial to buy SIBL CDs.

159. On August 29, 2008, STC's Board of Directors held another special session meeting to discuss Fournet's departure and Jim Weller's appointment as STC's new President. In attendance were Haymon, Frazer, Reynaud, Parrish, and Weller. Bogar did not attend. Weller reported that Defendant Austin had met with the OFI to update STC on any additional items requested by the OFI. Weller also reported that he met with an accounting firm that he believed could give the OFI comfort regarding Antigua's regulatory and audit standards.

160. In response to Defendant Austin's meeting with Sidney Seymour, A&R frantically researched STC's files and the Antiguan FSRC to examine the issues raised by the OFI. Instead of resolving these issues, however, A&R's investigation raised even more red flags. For example, **A&R reviewed a random selection of STC's IRA account files and discovered that *none* of those files contained the necessary disclosure statements required under STC's internal procedures. Additionally, A&R's legal research showed that the Antiguan FSRC was violating its *own directives* by refusing to cooperate with Louisiana's OFI.**

---

161.    On September 22, 2008, the Financial/Audit Committee of STC's Board of Directors met to discuss STC's financial results. In attendance were Frazer, Jackson, and Weller. Bogar did not attend. Weller updated the committee regarding STC's response to the OFI's 2007 Report and stated that a valuation report for the SIBL CDs should be available in October 2008. Weller also confirmed that STC's investments in SIBL CDs had ceased on August 15, 2008. At this point, Frazer questioned how this action would impact STC's 2008 revenue with no additional revenue generated by SIBL CDs. He added, "*STC could end with a substantial loss for the year.*"

### q.    Stanford Financial Moves the IRA Plan Away From STC

162.    Frazer was right. When the OFI forced STC to stop investing its clients' money in SIBL CDs, the company's revenues collapsed because it was no longer earning fees from SIBL. To respond to this crisis, Stanford Financial decided to move its IRA business away from STC to a third-party trustee, International Bank and Trust ("International Trust"). Stanford Financial intended to transfer STC's 1,264 IRA accounts with SIBL CD investments to International Trust but it could not complete this transfer before the SEC seized Stanford Financial in February 2009. When the government's seizure finally occurred, Stanford Financial's records reveal that STC purportedly held over $300 million in SIBL CDs.

### r.    A&R's Final Act of Betrayal

163.    A&R continued to show its true colors in the final days of the Stanford Ponzi scheme. On January 13, 2009, Stanford Financial's General Counsel – North America, Larry Fontana, wrote to Defendant Schmidt and requested that he communicate with Stanford Financial's auditors concerning significant STC matters to which A&R had devoted substantive attention in 2008. Despite the considerable amount of time that A&R spent representing STC in

2008 related to the OFI's examination, A&R did *not* disclose this matter in its audit response letter dated February 6, 2009. Nor did A&R list the numerous claims against STC that A&R had defended in 2008, which stood in stark contrast to the disclosures in A&R's audit response letter for the prior year, dated March 24, 2008. Rather, A&R's February 6, 2009 letter simply stated that "some or all of [STC's] matters . . . have been settled or otherwise resolved." Ironically, A&R's false response to STC's auditor, BDO Seidman, was issued just days before the Stanford Ponzi scheme finally collapsed. This final act of betrayal against STC and Stanford Financial provides further proof of A&R's substantial assistance to the Stanford Ponzi scheme.

### s.    The Defendants' Culpable Conduct

164.    Incredibly, the red flags were everywhere and yet the Defendants continued to ignore those red flags in reckless disregard of their fiduciary obligations to STC. While the deceptive machinations of Allen Stanford and his co-conspirators certainly dictated the course of this fraudulent scheme, the Defendants' purportedly "independent" legal and fiduciary services fueled the engine for that scheme. Without the Defendants' reckless disregard of their fiduciary obligations to STC, the IRA portion of the Stanford Ponzi scheme would not have survived, and at a minimum, the approximately $300 million in funds that STC *should have been holding* in SIBL CDs when the scheme collapsed would not have been improperly diverted from STC and subsequently misappropriated from Stanford Financial companies, subjecting Stanford Trust Company to hundreds of millions of dollars in increased liabilities.

165.    Through their years of faithful service for Stanford Financial, including STC and SGC, the Lawyer Defendants[6] acquired extensive knowledge of Stanford Financial's fraudulent operations and STC's illicit business relationship with SIBL and SGC. Despite this knowledge,

---

[6]  The "Lawyer Defendants" have been previously defined as Defendants A&R, BSW, Schmidt, Austin and Reynaud. However, Reynaud is also sued as a Director Defendant.

80276v.1

the Lawyer Defendants continuously ignored numerous red flags that evinced the hallmarks of a Ponzi scheme and continued to service Stanford Financial without question. In doing so, they played a pivotal role in furthering the Stanford Ponzi scheme.

166.   The Lawyer Defendants' knowledge and conduct demonstrates their awareness that Stanford Financial's directors and officers, including those at STC and SGC, were continuously breaching their fiduciary duties to the Stanford Financial group of companies. Additionally, the Lawyer Defendants' knowledge and conduct demonstrates that each of them was aware of their   own participation in these breaches of fiduciary duties.  The Lawyer Defendants' awareness and participation in these fiduciary breaches assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies, including at least $300 million in funds that STC should have been holding in SIBL CDs that were improperly diverted and subsequently misappropriated from Stanford Financial companies.

167.   The Director Defendants,[7] through their service as Directors of STC, continuously ignored the red flags discussed throughout this complaint and were grossly negligent in failing to detect and stop the flow of STC IRA account funds into the SIBL CDs.  Despite their knowledge that hundreds of millions of dollars of STC IRA account funds were being directed into SIBL CDs by STC and/or its affiliate SGC, and STC's complete dependence upon the continued income stream coming from referral fees paid by SIBL, the Director Defendants ignored their fiduciary obligations to STC and failed to do anything to investigate the viability of SIBL and its ability to continue to pay the referral fees upon which STC so heavily depended.  As a result of the Director Defendants' gross negligence in violation of their fiduciary duties to STC, STC has

---

[7] The "Director Defendants" have been previously defined as Defendants Reynaud, Haymon and Frazer.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                                PAGE 71

incurred hundreds of millions of dollars in liabilities to the STC IRA Account holders as a result of the total loss of their investment in the CDs and assertion of claims in the receivership against STC. Because of the Director Defendants' gross negligence and focus on the inappropriate sale of SIBL CDs to the STC IRA customers, the Director Defendants also caused STC to fail to develop the legitimate trust business, the value of which has been lost by STC. The Director Defendants owed fiduciary duties to STC to use reasonable care in operating and managing STC, and to operate STC's business in a reasonably prudent manner. The Director Defendants also owed fiduciary duties to STC to operate STC in compliance with all applicable laws and regulations. The Director Defendants breached their fiduciary duties by failing to use reasonable care in operating and managing STC, failing to operate STC's business in a reasonably prudent manner, and failing to operate STC in compliance with all applicable laws and regulations. Specifically, the Director Defendants breached their fiduciary duties to STC by continuously ignoring the numerous red flags discussed in this Complaint and failing to properly inform themselves about the activities and investments of SIBL despite knowing that hundreds of millions of dollars in STC IRA account funds were being directed into SIBL CDs by STC or STC's affiliate SGC. The Director Defendants acted with so little information about SIBL that their decisions allowing STC to purchase and/or hold SIBL CDs for IRA accountholders — *without any due diligence on SIBL or its purported investment portfolio* — were unintelligent and ill-advised, and therefore constituted gross negligence in violation of their fiduciary duties under applicable statutory law as directors of a Louisiana trust company. The Director Defendants failed to properly supervise STC's operations, failed to verify STC's compliance with its own policies and procedures, and failed to ensure STC's compliance with applicable laws and regulations. Such conduct constituted gross negligence as defined in Title 6, § 2(9) of

the Louisiana Revised Statutes,  The Director Defendants' breaches of their fiduciary duties to STC proximately caused STC to incur hundreds of millions of dollars of increased liabilities, for which Defendants should be held jointly and severally liable.  In addition, the Director Defendants should be held liable for STC's loss of the profits and value of its legitimate trust business, where STC was serving as trustee or co-trustee on customer's trust accounts or managing other accounts whose funds were not improperly directed into SIBL CDs. Defendants' breaches of their fiduciary duties to STC further caused STC to lose over $771,000 of STC's capital which the directors also authorized to be invested in the SIBL CDs, for which Defendants should be held jointly and severally liable in addition to the increased liabilities.

## VI.    STATUTE OF LIMITATIONS DEFENSES

**A.    Discovery Rule / Inquiry Notice / Equitable Tolling**

168.    The SEC filed an action against Allen Stanford and SIBL *et al.* on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, Defendants' participation in the Stanford Ponzi scheme and the true nature of the injury suffered by Stanford Financial.  Moreover, the Defendants' wrongful acts were inherently undiscoverable.  Plaintiffs also assert the doctrine of equitable tolling.

## VII.    CAUSES OF ACTION

169.    For each of the following causes of action, Plaintiffs incorporate by reference and reassert the allegations above as if fully set forth below.

**COUNT 1:    Breaches of Fiduciary Duties**

170.    The Director Defendants owed fiduciary duties to STC to use reasonable care in operating and managing STC and to operate STC's business in a reasonably prudent manner.

The Director Defendants also owed fiduciary duties to STC to operate STC in compliance with its own policies and procedures, and in compliance with all applicable laws and regulations. The Director Defendants breached their fiduciary duties by failing to use reasonable care in operating and managing STC, failing to operate STC's business in a reasonably prudent manner, and failing to operate STC in compliance with all applicable laws and regulations. Specifically, the Director Defendants breached their fiduciary duties to STC by continuously ignoring the numerous red flags discussed in this Complaint and recklessly allowing STC and/or its affiliate SGC to direct hundreds of millions of STC IRA account funds into the worthless SIBL CDs. By ignoring these red flags and acting without any knowledge of the activities and investments of SIBL, the Director Defendants allowed STC to be dominated, controlled and exploited by SGC, SIBL, and Stanford Financial generally, such that STC did not further its own interests but rather served the interests of the Stanford Ponzi scheme to its own detriment. The Director Defendants breached their fiduciary duties by allowing STC to purchase and/or hold SIBL CDs for IRA accountholders without performing, or ensuring that STC performed, sufficient due diligence on SIBL's operations, activities and investment portfolio. While STC attempted to enter into contracts with customers that were styled as so-called self-directed IRA accounts, and disclaimed any responsibility for the customers' investment decisions, such contracts were in fact a sham and entered into as part of the ongoing Ponzi scheme. Rather than being self-directed, STC's IRA account holders were in fact directed by STC and/or its affiliate SGC to invest their IRA accounts in the SIBL CDs. The Director Defendants were reckless and grossly negligent in failing to stop this from occurring when they knew nothing about SIBL and its investments. The Director Defendants willful failure to have looked into the legitimacy of SIBL allowed STC to be used as a pawn in Stanford's Ponzi scheme in derogation of their fiduciary obligations to

manage STC's affairs in a reasonably prudent manner. The Director Defendants' willful, reckless, and/or grossly negligent acts and omissions demonstrate an entire want of care and actual conscious indifference to the rights, safety, and welfare of STC, . and manifest an actual awareness by the Director Defendants that their conduct posed an extreme degree of risk and likelihood of serious injury to STC. The Director Defendants' gross negligence in breaching their fiduciary duties to STC caused STC to incur hundreds of millions of dollars of liabilities it would not otherwise have incurred, destroyed the profits and value of STC's trust account business that was unrelated to the SIBL CD investments, and caused the loss of over $770,000 due to the grossly negligent investment of STC's capital into the SIBL CDs. The Director Defendants' breaches of their fiduciary duties to STC were a proximate cause of hundreds of millions of dollars in actual damages to STC, and therefore to the Committee as assignee from the Receiver.

**COUNT 2:    Respondeat Superior**

171.    Defendant BSW is liable for the tortious acts of its employee and partner, Defendant Reynaud. Defendant Reynaud was at all material times acting within the course and scope of his employment with BSW, and in furtherance of BSW's business, when he engaged in the wrongful conduct described herein.

## VIII.  ACTUAL DAMAGES

172.    STC suffered actual damages in the form of hundreds of millions of dollars in increased liabilities, the loss of the profits and value of STC's legitimate trust business, as well as the loss of over $770,000 as a result of the investment of STC's own capital into the worthless SIBL CDs, as a direct and proximate result of the Defendants' wrongful conduct described herein. Therefore, the Receiver, and the Committee as assignee from the Receiver, standing in

the shoes of STC, have suffered hundreds of millions of dollars in losses as a proximate result of the Defendants' wrongful conduct, for which they are entitled to recovery from Defendants. In addition, the Receiver, and the Committee as assignee of the Receiver, are entitled to recover their just and reasonable attorneys' fees, subject to Court approval, as it would be inequitable not to award such fees to them. The Receiver and the Committee have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

## IX.   PUNITIVE DAMAGES

173.   The Receiver's and/or the Committee's injuries resulted from Defendants' gross negligence, which entitles the Receiver and/or the Committee to exemplary damages in an amount necessary to punish the Defendants and to deter similar conduct by others in the future.

## X.   CONDITIONS PRECEDENT

174.   All conditions precedent to filing this Complaint have been met.

## XI.   JURY DEMAND

175.   The Receiver and the Committee demand a trial by jury.

## PRAYER

WHEREFORE, the Receiver and the Committee request that the Defendants be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Receiver and the Committee recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees. The Receiver and the Committee pray for such other relief to which they may be justly entitled.

Dated:  August 4, 2014

Respectfully submitted,

**NELIGAN FOLEY, LLP**

By:    _/s/ Douglas J. Buncher_

Douglas J. Buncher
dbuncher@neliganlaw.com
Nicholas A. Foley
nfoley@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**ATTORNEYS FOR RALPH S. JANVEY,
IN HIS CAPACITY AS RECEIVER FOR
THE STANFORD RECEIVERSHIP ESTATE**

**CASTILLO SNYDER, P.C.**

By:    _/s/ Edward C. Snyder_
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
300 Convent Street, Suite 1020
San Antonio, Texas  78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**BUTZEL LONG PC**

By:    /s/ Peter D. Morgenstern
       Peter D. Morgenstern (*admitted pro hac vice*)
       morgenstern@butzel.com
       380 Madison Ave
       22nd Floor
       New York, NY 10017
       (212) 818-1110
       (212) 818-0494 (Facsimile)

**ATTORNEYS FOR THE OFFICIAL
STANFORD INVESTORS COMMITTEE**

### CERTIFICATE OF SERVICE

On August 4, 2014, all counsel of record were served through the Court's ECF system.

       /s/ Douglas J. Buncher

80276v.1

---